720 So.2d 654 (1998)
Peter DAYE, as Provisional Tutor of the minor, Samuel Goodwin
v.
GENERAL MOTORS CORPORATION, et al.
No. 97-C-1653.
Supreme Court of Louisiana.
September 9, 1998.
Rehearing Denied October 30, 1998.
*655 Jesse D. McDonald, Hudson, Potts & Bernstein, Monroe, Howard B. Kaplan, Paul V. Cassisa, Paul V. Cassisa, Jr., Bernard, Cassisa, Elliot & Davis, Metairie, for Applicant.
James F. Howell, Jeffrey W. Weiss, Wiener, Weiss & Madison, Shreveport, James D. Turnage, Shreveport, for Respondent.
TRAYLOR, Justice.[*]
This case arises from a September 16,1986 single-car accident which left plaintiff paralyzed from the waist down. We granted the defendant's writ in this case to examine the lower courts' finding that the defendant had made negligent misrepresentations which were a substantial factor in causing plaintiff's *656 injuries.[1] The defendant, General Motors Corporation (GM), was found 25% responsible for plaintiffs injuries for negligent misrepresentation in advertising its 1986 Corvette. The jury found plaintiff, Samuel Goodwin (Samuel), 75% responsible for his injuries for failure to maintain control of his vehicle in the accident. We reverse the findings of the lower courts because we find plaintiff to be 100% responsible for the injuries he sustained which resulted solely from his own negligence and failure to maintain control of his vehicle.

FACTS
In the summer and fall of 1984, Samuel, a long-time Corvette enthusiast, asked his parents for a 1985 Corvette for his fifteenth birthday. Samuel's father, John, decided not to buy Samuel the Corvette because, among other reasons, he felt Samuel needed more driving experience.
Later that year, Chevrolet introduced the 1986 model year Corvette equipped with Bosch II ABS anti-lock braking system (ABS), a then revolutionary, state-of-the-art braking system developed exclusively for Corvette. The 1986 Corvette was the first passenger vehicle manufactured in this country with anti-lock brakes. GM introduced the 1986 model by launching a promotional campaign using television, magazines, and other promotional media such as brochures, pamphlets, and catalogs. The gist of the campaign was to inform consumers that the 1986 Corvette was equipped with ABS brakes which would never "lock up" in emergency braking maneuvers and that because the wheels continued to roll, the driver would maintain steering control in certain situations: previously not possible with the regular, hydraulic brakes available in other vehicles.
In the fall of 1985, armed with the Corvette promotional information, sixteen-year-old Samuel persuaded his father to buy the 1986 Corvette. Purchased as a surprise gift, the vehicle fulfilled Samuel's five-year longing to own a Corvette and heightened his preoccupation with the vehicle. Samuel testified that for years he had been collecting and reading all materials he could attain regarding Corvettes. Despite this testimony, Samuel later admitted that he read none of the information on the braking system or handling of the Corvette contained in the owner's manual. GM furnished Samuel with an owner's manual which contained a section regarding the function and proper use of ABS brakes. It read:
The anti-lock brake system is designed to prevent lock-up of the wheels during braking by automatically releasing and reapplying each front wheel brake independently, and both rear wheel brakes as a pair. This occurs only during a brake application, which would have caused one or more wheels to skid. When this happens, it causes the brake pedal to pulsate, and it may push back against your foot. This is normal. A pulsating brake pedal may be an indication of a slippery road. Adjust your driving accordingly. When a brake application is not enough to cause a wheel to lock up, the brakes are operating in the same way as conventional brakes, and the pedal will not pulsate. Remember, even though the car has anti-lock brakes, following too closely behind another vehicle still might not allow enough time to avoid a collision if the other vehicle slows suddenly, Maintain a safe distance from the vehicle ahead ... During a brake application that would cause one or more wheels to skid, the anti-lock feature is designed to help you maintain ... steering control, but there still could be some loss of directional control under these conditions. Driving too fast around curves, or turns, especially on slippery pavement may also result in loss ... of directional control. Drive only as fast as conditions permit. Remember, loss of directional control can cause an accident ... Driving too fast around curves, or turns, especially on slippery pavement, might also result in loss of directional control. Even with a functioning anti-lock brake system, drive steering and braking traction are reduced on slippery surfaces. Slow down and adjust *657 your driving to such conditions.[2] (Emphasis added)
Disregarding the warnings set forth in the owner's manual and despite numerous warnings from both his mother and father, Samuel admitted that he routinely disregarded speed limits and regularly drove the Corvette at excessive speeds. Samuel testified that he drove the Corvette as fast as 140 miles per hour and believed this was not an excessive speed and that he "did not think it was possible to drive the Corvette too fast." He testified that, at that time, he felt the ABS would prevent his Corvette from slipping or skidding "in any way whatsoever" and that ABS would allow him, a young and inexperienced driver, to perform like a seasoned race car driver.
As of September 12, 1986, Samuel had driven the Corvette for approximately eleven months and logged some 27,000 miles on the vehicle. That night, he and three of his classmates met at a friend's hunting camp on Louisiana Highway 3049, the "Old Dixie Highway," a two-lane country road which borders the Red River. They planned to spend the night at the camp, drink beer,[3] play cards, and dove hunt the next morning. At approximately eleven p.m., members of the group became hungry and Samuel agreed to drive the eighteen miles into Shreveport to pick up some hamburgers at Burger King, his third trip to Burger King that night. En route, Samuel traveled on the Old Dixie Highway, which had a posted speed limit of fifty-five miles per hour, at speeds exceeding one hundred miles per hour in the straightaways.
As Samuel approached a portion of the road known locally as "dead man's curve," he claims to have slowed to approximately twenty-five miles per hour, safely negotiated the curve, and then resumed speeding to approximately eighty-five miles per hour. As he approached the curve where he was to have the accident, Samuel passed two signs: one reducing the speed limit to 45 miles per hour, and a second warning sign which read, "Drive carefully, a substandard roadway." Although Samuel testified at trial that he did not look at his speedometer, he stated at various times that he entered the curve traveling between sixty-five and eighty miles per hour. He testified that he applied the brakes in this curve because it was nighttime and he wanted to slow down as he was approaching Shreveport. Yet, he testified in his deposition that he braked because he was driving "too fast for the curve" and needed to slow down to safely negotiate the curve. Although he testified that he had driven through this curve at the same speed innumerable occasionstwice on that very nightand never before felt the need to use his brakes, he felt the need to slow down at this particular time. He adamantly maintains that the brakes did not respond the first time he pressed the pedal and that he "mashed" the brake pedal a second time and simultaneously lost control of the vehicle.
At trial, all experts agreed that there was no malfunction of either the ABS or back-up hydraulic braking systems. Furthermore, the experts agreed that plaintiff erroneously applied the brakes in the curve so that the added braking load on the tires, combined with the side load from centrifugal force against the vehicle in the curve, forced the vehicle from the road.
At trial, expert testimony from various accident reconstructionists and engineers revealed the following sequence of events. After Samuel applied the brakes, the "high lateral acceleration," combined with the vehicle's capacity to hold the road and the skill level of the driver in handling and controlling the vehicle, caused the tail end of the car to slide to the left as the car yawed clockwise. The vehicle traveled across the oncoming lane of traffic, crossed the shoulder, and exited the highway to the left. At some point in the course of these events, Samuel *658 ducked his head below the dashboard, doing nothing further to maintain control of the vehicle. It plunged through roadside underbrush, spun three-quarters of a revolution and collided passenger-side first into a barbed wire fence. The vehicle stopped sliding when the tires caught on the fence, whereupon the car "tripped" and became airborne. It flipped over twice and came to rest on its roof, having dropped approximately fifteen feet off a bluff.
Neither Samuel nor the passenger were wearing their seatbelts. Samuel suffered a severe spinal injury and is a paraplegic. The passenger suffered minor lacerations.

PROCEDURAL HISTORY
In 1987, Peter Daye, as provisional tutor of the minor, Samuel Goodwin, brought suit against GM; United Services Automobile Association (USAA), John Goodwin's automobile liability insurer; Travelers Indemnity Insurance Company (Travelers), John Goodwin's comprehensive liability insurer pursuant to a homeowners policy; and Courtesy Chevrolet. In the original petition, Samuel alleged his father, John, was negligent in purchasing the Corvette for Samuel, a sixteen year-old with a propensity to speed. The plaintiff further alleged GM and Courtesy Chevrolet were liable for marketing and placing an attractive nuisance in retail trade and commerce.
The trial court granted a motion for summary judgment in favor of Travelers and dismissed Travelers from the suit. The court also granted a motion for summary judgment in favor of USAA. In 1993, plaintiff's claim against GM evolved when he amended the pleadings to focus on representations alleged to have been made by GM in its promotional campaign regarding the driving capabilities, safety features, and ABS braking system distinct to the 1986 Corvette. In May of 1993, Samuel had reached the age of majority and amended his petition to add the State, through the Department of Transportation and Development (DOTD), as a defendant. John Goodwin, enrolled as cocounsel for the plaintiff.[4] In his final amended petition filed on March 15, 1994, plaintiff claimed that his father bought the Corvette based upon representations of its safety by GM and the dealer, Courtesy Chevrolet.
A trial against the remaining defendants, DOTD, Courtesy Chevrolet, and GM, was held from September 11, 1995 through September 23, 1995. The jury returned a verdict finding both GM and plaintiff at fault. The jury assigned liability to GM based on its finding that GM had made negligent misrepresentations which were a substantial factor in causing Samuel's injuries. The jury assigned 75% of the fault to Samuel, 25% to GM, 0% to the DOTD, and 0% to Courtesy Chevrolet, Inc. The jury awarded Samuel, before any reduction for his fault, $1,425,00.00 in general damages, $175,000.00 in past medical expenses, $400,000.00 in future medical expenses, but made no award for past or future lost earnings.
Upon plaintiff's motion for JNOV, the trial judge reversed the jury's allocation of fault, assigning 75% of the fault to GM and 25% to Samuel. The court of appeal reversed the trial court's grant of the JNOV and reinstated the jury's allocation of fault. This Court granted certiorari to consider GM's liability under the circumstances of this case.

STANDARD OF REVIEW
A trial court's findings of fact will not be disturbed unless the record establishes that a factual, reasonable basis does not exist and the finding is clearly wrong or manifestly erroneous. Syrie v. Schilhab, 96-1027 (La.5/20/97); 693 So.2d 1173, 1176; Ferrell v. Fireman's Fund Ins. Co., 94-1252 (La.2/20/95), 650 So.2d 742, 745; Stobart v. State, Through Dept. of Transp. and Development, 617 So.2d 880, 882 (La.1993); Rosell v. ESCO, 549 So.2d 840, 844 (La.1989); Arceneaux v. Domingue, 365 So.2d 1330 (La. 1978). Where two reasonable views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Stobart, 617 So.2d at 882 *659 83. Although deference should be accorded to the factfinder, the court of appeal and this court have a constitutional duty to review facts. Stroik, 699 So.2d at 1079; Ambrose v. New Orleans Police Department Ambulance Service, 93-3099 (La.7/5/94), 639 So.2d 216, 221. Therefore, it is improper to assert that a trial court's factual determinations "cannot ever, or hardly ever, be upset." Ambrose, 639 So.2d at 221.
The issue to be resolved by the reviewing court is not whether the trier of fact is right or wrong, but whether the factfinder's conclusion was a reasonable one. Syrie, 693 So.2d at 1176; Stroik, 699 So.2d at 1079. After a thorough review of the record, we find that it was manifest error to assign any percentage of fault in plaintiff's injuries to GM under the theory of negligent misrepresentation.

NEGLIGENT MISREPRESENTATION
In order for a cause of action based on negligent misrepresentation to stand, the alleged representations made by GM to the plaintiff must be classified as negligent misrepresentations. Barrie v. V.P, Exterminators, Inc., 93-0679 (La.1993), 625 So.2d 1007, 1011 (citing W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS, § 107, at 745-746 (5th ed.1984)). In general, the courts of this state have recognized that La. Civ.Code arts. 2315 and 2316, the code articles defining tort law, encompass an action for negligent misrepresentation. Devore v. Hobart Mfg. Co., 367 So.2d 836, 839 (La. 1979). However, our jurisprudence has also limited negligent misrepresentation tort theory to cases wherein contract or fiduciary relationship exists. Barrie, 625 So.2d at 1014; Ernestine v. Baker, 515 So.2d 826, 827-28 (La.App. 5th Cir.1987); Dousson v. South Central Bell, 429 So.2d 466, 468 (La. App. 4th Cir.1983), writ denied, 437 So.2d 1135 (La.1983); Beal v. Lomas and Nettleton Co., 410 So.2d 318, 321 (La.App. 4th Cir. 1982); Josephs v. Austin, 420 So.2d 1181, 1185 (La.App. 5th Cir.1982), writ denied, 427 So.2d 870 (La.1983).
We find no Louisiana case which allows a plaintiff to sue a defendant manufacturer for damages arising out of the negligent misrepresentations about its product. Nevertheless, we find that the broad language of Civil Code articles 2315 and 2316 affords protection for persons damaged by the negligent acts of others sufficient to encompass a cause of action for negligent misrepresentation. Louisiana negligent misrepresentation cases are evaluated using the duty-risk analysis. Barrie, 625 So.2d at 1015; Syrie, 693 So.2d at 1176. We therefore turn to this analysis.

The Duty-Risk Analysis
The duty-risk analysis is employed on a case by case basis. Harris v. Pizza Hut of Louisiana, Inc., 455 So.2d 1364, 1369 (La. 1984). Plaintiff must prove that the conduct in question was a cause-in-fact of the resulting harm, the defendant owed a duty of care to the plaintiff, the requisite duty was breached by the defendant and the risk of harm was within the scope of protection afforded by the duty breached. Id; Berry v. State, Through Dept. of Health and Human Resources, 93-2748 (La.5/23/94), 637 So.2d 412, 414; Mundy v. Dept. of Health and Human Resources, 92-3251 (La.6/17/93), 620 So.2d 811, 813.

Cause-in-Fact
Generally, the outset determination in the duty-risk analysis is cause-in-fact. Boykin v. Louisiana Transit Co., Inc., 96-1932 (La.3/4/98), 707 So.2d 1225; Pierre v. Allstate Ins. Co., 257 La. 471, 242 So.2d 821 (1970). The inquiry to be made is whether the accident would have occurred but for the defendant's alleged substandard conduct or, when concurrent causes are involved, whether defendant's conduct was a substantial factor in bringing about the accident. Breithaupt v. Sellers, 390 So.2d 870, 873 (La.1980); LeJeune v. Allstate Ins. Co., 365 So.2d 471, 475 (La.1978); Dixie Drive It Yourself System New Orleans Co. v. American Beverage Co., 242 La. 471, 137 So.2d 298, 302 (La.1962).
In the present case, the inquiry is whether the plaintiff's accident would have been prevented had defendant not advertised that the 1986 Corvette's ABS brakes could be applied in the middle of a curve. The jury *660 found that "General Motors made negligent misrepresentations that were a substantial factor in causing injuries to the plaintiff." Although the jury's finding regarding cause-in-fact is a factual finding entitled to great deference, after a thorough review of the record, we find the conclusion that the promotional information caused plaintiff's injuries manifestly erroneous.
Plaintiff's own testimony refutes his assertions that the cumulative effect of these advertisements caused him to vigorously apply his brakes in the curve when the vehicle could not sustain such a maneuver. He was driving approximately eighty-five miles per hour, then released the accelerator to slow the car down gradually so that when he reached the curve at issue, he was traveling approximately sixty-eight miles per hour. He testified that he wanted to slow down because he was nearing town after dark. However, this contradicted his previous testimony wherein he stated that he "braked to slow down because [he] felt [he] needed to in order to safely negotiate the curve."
Samuel stated that he believed with ABS, "[t]he tires would not lock, they would not skid, they would not lose traction ... you maintain directional control and you wouldn't skid off out of your lane." This, however, is not what GM represented to Samuel. The owner's manual warned that ABS would not prevent loss of directional control which could be caused by "driving too fast around curves." In fact, the manual warned that the possibility of slipping was very real during hard braking and while braking in curves, which could result in an accident. The manual warned that drivers should adjust their driving according to road conditions and drive only as fast as conditions permit to avoid accidents. The promotional information merely asserted that ABS would "improve" a driver's ability to stop in emergency braking situations and that the wheels would not lock up, thereby making it possible for the driver to maintain steering control, even in a curve. GM did not guarantee that the car would not slide or lose its footing on the road under extreme driving applications. In fact, it explicitly warned that the opposite could occur.
Samuel testified that any car could be driven at such a speed that the driver could lose control and slip off of the road. However, he testified that at the time of the accident he believed that ABS brakes would prevent the Corvette from slipping or skidding "in any way whatsoever" and that he "did not think that it was possible to drive the Corvette too fast" and because "it was the best handling car in the world, a person with a sound mind behind the wheel was not going to get hurt." If his testimony is to be believed, he felt he could accomplish the physically impossible in his Corvette because it had ABS. He stated that he felt it was impossible for his Corvette to slide or for him to lose control because of these brakes. This is an unreasonable belief upon any reading of GM's promotional information regarding the 1986 Corvette and ABS.
In reality, plaintiff's vigorous application of the brakes while driving through a blind curve on a substandard two-lane country road at a breakneck speedand not his reliance on the promotional informationwas the cause of the accident. Plaintiff conceded that he felt he could not negotiate the curve at the speed in which he was traveling and braked to slow the vehicle to a more reasonable speed.
Upon a thorough review of the record on this issue, we find that the jury's decision assigning any liability to GM is manifestly erroneous. We find that the sole cause of Samuel's accident was his own negligence due to his excessive speed and his imprudent application of his brakes, not his reliance on GM's promotional information. A reasonable juror could not find that GM's promotional information could be the cause-in-fact of the instant accident. Therefore, we find that the accident would not have been prevented had GM not published the allegedly misleading promotional information.

CONCLUSION
A negligence case is properly examined under the duty-risk analysis. Boykin v. Louisiana Transit Co., 96-1932 (La.3/4/98), 707 So.2d 1225. A negative answer to any of the inquiries of the duty-risk analysis results in a determination of no liability. Stroik, 699 *661 So.2d at 1081. Because we find that plaintiff has failed the first prong of the duty-risk analysis, we need not examine the remaining elements and find no liability on the part of the defendant under the theory of negligent misrepresentation.
For the foregoing reasons, we find the jury's conclusions are not a reasonable view of the evidence. We find the jury's determinations were manifestly erroneous. Therefore, we reverse the decisions of the trial court and court of appeal and find for the defendant.
REVERSED AND RENDERED.
KIMBALL, J., dissents and assigns reasons.
CALOGERO, C.J., and KNOLL, J., dissent for reasons assigned by KIMBALL, J.
KIMBALL, Justice, dissenting.
Although I agree with the majority's recognition of the tort of negligent misrepresentation under Civil Code article 2315, I dissent from its finding that the jury was manifestly erroneous in assessing fault to General Motors (GM). After a trial in this case, the jury found GM 25% at fault and found Sam 75% at fault. The plaintiff moved for a Judgment Notwithstanding the Verdict ("JNOV"), praying for a reversal of the jury's allocation of fault. The trial judge granted the JNOV and reversed the jury's allocation of fault to 75% and 25% respectively. A five judge panel of the Second Circuit Court of Appeal, by a vote of 4-1, reversed the trial judge's JNOV and reinstated the jury's allocation of fault.[1] Upon a thorough review of the record, I cannot say the findings of the jury were manifestly erroneous.

STANDARD OF REVIEW
Article V, Section 10 of the Louisiana Constitution provides the appellate jurisdiction of a court of appeal extends to the law and facts. However, the exercise of this power has been jurisprudentially limited by the rule that a trial court's findings of fact will not be disturbed unless they are clearly wrong or manifestly erroneous. Ferrell v. Fireman's Fund Ins. Co., 94-1252,2 p. 3 (La.2/20/95), 650 So.2d 742, 745. This standard does not mean the reviewing court may simply review the record for evidence which supports or controverts the trial court's position. In contrast, the reviewing court must examine the entire record to determine if the trial court's findings were clearly wrong or manifestly erroneous. Stobart v. State, Through Dept. of Transp. and Development, 617 So.2d 880, 882 (La.1993). "[T]he issue to be resolved is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one." Id. The deference given the factfinder's determinations is great.
Stated another way, the reviewing court must give great weight to the factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts.

Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973).
As this court said in Rosell v. ESCO, 549 So.2d 840, 844 (La.1989), after a review of the entire record, the court of appeal may not reverse the trial court's findings, if those findings are reasonable, even though the court of appeal is convinced it would have weighed the evidence differently. Given the jury's verdict finding GM partially at fault, in conducting such a manifest error review in *662 this case it is incumbent upon this court to decipher the facts in the light most favorable to the plaintiff in order to give proper deference to the jury's verdict.
After a thorough review of the record, I find no manifest error in the determination of liability on GM's part.

FIRST AMENDMENT AND NATURE OF THE ADVERTISEMENTS
As an initial matter, I feel I must first address what, if any, impact the First Amendment would have relative to GM's liability. GM argued that in order to regulate speech, the state must have a compelling interest and the means used to regulate the interest must be narrowly tailored to accomplish the state's purpose. GM further argued, absent a proven clear and present danger, its advertisements are protected by the First Amendment In Central Hudson Gas & Elec. Corp. v. Public Serv. Comm., 447 U.S. 557, 563, 100 S.Ct. 2343, 2359, 65 L.Ed.2d 341 (1980), the Court observed, "The First Amendment's concern for commercial speech is based on the informational function of advertising. (citation omitted) Consequently, there can be no constitutional objection to the suppression of commercial messages that do not accurately inform the public about lawful activity." The Court went on to conclude, "[f]or commercial speech to come within the protection of the First Amendment, at a minimum it must at least concern a lawful activity and not be misleading." Id. at 566, 100 S.Ct. 2343, 2351. Therefore, if a jury determines that an advertisement is misleading, that advertisement will not be shielded by the First Amendment as was argued by GM.
Upon a review of the record, I cannot say the jury's determination GM's advertisements were misleading was manifestly erroneous. During the lengthy trial, the jury was presented with the advertisements themselves and testimony which addressed the alleged misleading nature of those advertisements regarding the 1986 Corvette's safety, handling, and revolutionary new braking capabilities.
For example, in describing the 1986 Corvette's braking system, a feature story in the Corvette catalog described a hypothetical involving the fabled German autobahn:
A light rain is falling. You come over the top of the hill, halfway through a long sweeping curve that keeps bending away out of sight ahead of you, when suddenly you come upon the grandmother of all traffic jams. What do you do? Nothing cute, that's for certain. You simply apply the brakes and hope for the best.
Your Corvette will stop. In fact, it will stop so well that you'll be proud, pleased and perfectly amazed. You can express your gratitude to one of the best friends you'll ever have, a device called the Bosch ABS II anti-lock braking system.
In the "Corvette News," GM's articles featured stories which described how the ABS worked, how it was designed, and what its presence meant in terms of handling and braking. The articles described how, because of ABS technology, the 1986 Corvette was able to brake and steer at the same time. The articles proclaimed the ABS worked so well, if you were forced to brake on an icy surface, you may not know the road you were on was icy. Furthermore, "[b]ecause ABS provides the ability to always get a controlled stop in the shortest possible distance, Corvette race drivers will have to change their driving techniques ... you can go quite a bit deeper into a corner, apply the brakes very hard and let the system prevent loss of control."
GM also advertised the 1986 Corvette and its revolutionary ABS in popular magazines such as "Road & Track," "Car and Driver," and "Motor Trend." These advertisements described the Corvette as "a machine of almost heroic capabilities," possessing a "new dimension to car control" matching its suspension and tires "to its standard anti-lock brake system." Some of the advertisements featured photographs, graphs, diagrams, and text which also extolled the improved braking capability of the 1986 Corvette. In one of these advertisements, the headline read: "The 1986 Corvette incorporates technology that allows you to maintain steering control during hard braking-even on a rain slick curve." The advertisement went on to describe *663 a test where the 1986 Corvette was matched against some of the world's finest sports cars. Describing the test and the results, the advertisement explained how on a rain-slick, 150 foot radius curve, at maximum braking in USAC-certified testing, only the 1986 Corvette was able to steer and brake simultaneously, safely negotiating the curve. In a similar advertisement, the headline read: "Anti-lock braking power you can grade on a curve." The photographs above the bold-face headline depicted four of the world's finest sports cars sliding out-of-control on a rain-slick curve, while the photograph below the bold-faced headline depicted the Corvette in control, apparently on the same rainy curve. Below the photograph was a graph which seemed to outline the test results. In the graph, the Corvette was shown as remaining in its lane while it negotiated the curve. In contrast the other vehicles were portrayed as continuing to go straight rather than remaining in their lanes as the curve began to sweep. The following text was found in the bottom third of the full page ad:
You're driving 55 mph on a rain-slick curve. Suddenly the unexpected: You stand on the brake pedal and steer to stay in your lane. You might expect Europe's most exotic cars to handle such a crisis effortlessly. Yet for all its awesome straight-line braking ability, Ferrari 308 GTSi failed to negotiate a 150-foot radius curve at maximum braking in USAC-certified testing ... Only the 1986 Corvette demonstrated the ability to steer and stop in these conditions at the same time. Only Corvette made the turn while coming to a controlled stop. When conditions turn foul, Corvette's new computerized Bosch ABS II anti-lock braking system is designed to help improve a driver's ability to simultaneously brake and steer out of trouble. Why does the Corvette feature the world's most advanced braking technology? Because a world-class champion should give you the edge in an emergency.
Full single-page and two-page variations of this advertisement appeared in the different popular magazines.
Engineering experts who testified for the plaintiff stated that, in their opinion, the advertisements suggested a 1986 Corvette could come to a controlled stop from 55 m.p.h., on a rain-slick surface, in a 150 foot radius curve. The plaintiff's engineers testified this was physically impossible. Engineering experts who testified for the defendant conceded this point. However, the defense engineers felt the plaintiff's engineer's conclusion regarding the advertisement's message was in error. In the defense expert's view, the advertisement presented two sets of truthful facts, one set of facts established a hypothetical situation involving a rain-slick surface and a vehicle traveling at 55 m.p.h., while the second set of facts described an actual test which was successfully conducted involving a 150 foot radius curve at maximum braking, with no indication of speed. Although steadfastly adhering to his position each portion of the particular advertisement in question was truthful, one of the defense's experts admitted on cross-examination it was possible the advertisement could be "misread."[2]
As is often the case in a civil trial, experts who testified on the plaintiff's behalf consistently stated the advertisements produced by GM were misleading; conversely, with the exception of the two advertisements mentioned, defense experts consistently stated the advertisements were not misleading. In this case, the jury was clearly presented with two reasonable views. When a jury is presented with two reasonable views, their choice between the two cannot be manifestly erroneous. Rosell v. ESCO, supra. For this reason, I cannot say the jury's determination *664 GM's advertisements were misleading was manifestly erroneous. A finding that the advertisements were misleading is the first step in the analysis and not the end of the inquiry into whether or not GM is liable for the injuries sustained by the plaintiff. In order to be held liable for the misrepresentations, the plaintiff must also prove, as in all civil cases, the defendant is liable under one of the theories of liability.

LIABILITY
The plaintiffs in this case allege, among other things, GM, through its advertisements, negligently misled Sam and his father regarding the 1986 Corvette's safe handling and braking capabilities. The cumulative effect of these advertisements was to instill in Sam a particular mindset regarding the 1986 Corvette's safe handling and braking capabilities. Upon a thorough review of the record on this issue, I cannot say the jury's determination on liability was manifestly erroneous.
Civil Code articles 2315 and 2316 represent the fountainhead of responsibility. Langlois v. Allied Chemical Corp., 258 La. 1067, 249 So.2d 133, 137 (La.1971). In determining whether liability exists for negligent conduct, this court has adopted the "duty/risk" analysis.

Cause-in-Fact
The first element in the "duty/risk" analysis is cause-in-fact. Cause-in fact is a factual question to be determined by the factfinder. Theriot v. Lasseigne, 93-2661 (La.7/5/94), 640 So.2d 1305; Cay v. DOTD, 93-0887 (La.1/14/94), 631 So.2d 393. The element of cause-in-fact establishes a causal relationship between the alleged negligent act and the injury sustained. Frank L. Maraist & Thomas C. Galligan, Louisiana Tort Law § 4-1 (1st ed.1996). Cause-in-fact can be met by showing "but for" the defendant's conduct, the plaintiff would not have sustained an injury. Alternatively, the plaintiff can show the defendant's conduct was a "substantial factor" in the plaintiff's injury. Dixie Drive It Yourself System New Orleans Co. v. American Beverage Co., 242 La. 471, 137 So.2d 298, 302 (La.1962) ("Negligent conduct is a cause-in-fact of harm to another if it was a substantial factor in bringing about that harm.") See also LeJeune v. Allstate Ins. Co, 365 So.2d 471, 475 (La.1978); Breithaupt v. Sellers, 390 So.2d 870, 873 (La.1980). See generally Maraist & Galligan, §§ 3-4, and 4-1,2, and 3. In this case, the jury specifically found GM's misleading advertisements were a "substantial factor" in causing Sam's injuries.[3] After reading the record in the instant case and considering the great deference to be given to factual findings made by a jury, I cannot say this conclusion is manifestly erroneous.
The record clearly reveals Sam was an avid Corvette enthusiast who read everything he could about Corvettes. Sam testified that prior to reading the 1986 Corvette catalog, he had never heard of anti-lock brakes. The information regarding the ABS in the catalog was unequivocal; in fact, the catalog specifically proclaimed the information in the catalog was as comprehensive and factual as possible. The information in the catalog was subsequently confirmed and reinforced by the other advertisements Sam read in popular magazines. The cumulative effect of the advertisements was to instill in Sam and his father a false sense of the safe handling and braking capabilities of the 1986 Corvette.
The record also clearly indicates there was sufficient evidence upon which the jury could have based its decision the GM advertisements were a "substantial factor" in Sam's application of the brakes in the curve that fateful night. The curve in the roadway in which the accident took place has a radius of approximately 750 feet. The advertisements alleged to be misleading implied that one could safely negotiate a 150-foot radius rain slick curve. Defense expert testimony established that a 150-foot radius curve would be sharper and more severe than the 750-foot radius curve in which the accident took place. *665 This being the case, the jury could reasonably have concluded Sam was justified in believing he could safely negotiate the 750 foot radius curve when all of GM's own advertisements at least implied he could do so in a steeper curve. Given this information, then, it can be seen the jury's conclusion was not manifestly erroneous.
In any case, expert testimony established that, had he not applied the brakes, Sam could have traveled safely through the curve at a maximum speed of approximately 80 m.p.h. In fact, Sam testified that prior to the evening of the accident, he had driven his 1986 Corvette through the curve without incident at speeds of between 65 and 70 m.p.h. Furthermore, Mr. Sandy Samuels, who testified for the defense and who also regularly traveled the Old Dixie Highway, including the curve in question, stated he had driven through the same curve on a number of occasions at 75 m.p.h. In layman's terms, the reason Sam could have negotiated the curve safely the night of the accident had he not applied the brakes was because absent the added force of braking, the vehicle could have held the turn.
The record also reveals Sam was first introduced to the concept of anti-lock brakes when he read about the ABS found exclusively on the 1986 Corvette. He testified that after reading the GM advertisements about the ABS it was his understanding a driver could brake hard in high speed curves without losing control. Sam also testified had he known of the potential problem he would not have applied the brakes. On direct-examination, Sam was asked whether, at the time he applied the brakes, he thought it was safe to apply the brakes in the middle of the curve. He responded, "Yes, I did." When asked if he would have applied the anti-lock brakes in the curve had he been warned not to do so, he said that he would not have applied the brakes had they "been like regular hydraulic brakes." Sam went on to say he believed he could safely brake in the curve because, "That's what had been represented to me in everything I had ever read about the brakes, that I can do this." However, as the majority notes, on cross-examination, defense counsel repeatedly asked Sam if he applied the brakes in the middle of the curve because of the misrepresentations. To each of the questions, Sam responded that he applied the brakes because he was coming into town, at night, going 65 m.p.h. and wanted to slow down. Defense counsel asserted that Sam's answer was non-responsive and the trial judge sent the jury out for a discussion on the record. During the discussion, out of the jury's presence, the trial judge stated: "I believe the jury clearly hears those responses. They are making inferences from those responses and making conclusions, and I think they are perhapswell, I know they are smart and they understand what's going on, I believe." Obviously, the two sides were trying to establish what Sam's frame of mind was when he applied the brakes. Obviously, both sides were trying to establish the element of cause-in-fact, or a lack thereof. As a result the jury heard testimony from which they could have reasonably determined Sam hit the brakes because of his reliance on the advertisements.
In the ordinary circumstance, it may be unreasonable for an individual to rely so heavily on an advertisement regarding the safe operation of a vehicle. For example, had GM's only advertisement regarding the hard braking ability of the 1986 Corvette been the mention of ABS in the feature article and the hypothetical involving the autobahn, Sam's reliance may have been unjustified because these advertisement are not misleading in and of themselves. However, in addition to these two advertisements, GM also put forth what appeared to be objective, scientific information which was consistent with and supported all of the other advertisements. For example, the 1986 Corvette catalog specifically noted the factual and comprehensive nature of its information and described the 1986 Corvette's handling capabilities in mathematical terms. According to the plaintiff's experts and one of the defendant's own experts, this information was misleading. The advertisements which appeared in the popular magazines complemented what Sam had read in the GM publications. Again, as an example, one of the advertisements mentioned earlier was made to appear as if it was merely reporting the results of a hard braking test, conducted on *666 a wet surface, wherein the 1986 Corvette outperformed some of the world's finest sports cars. These test results were in complete harmony with the "facts" presented in the 1986 Corvette catalog. Again, the plaintiff's experts testified this advertisement was misleading and the defendant's expert conceded the advertisement could have been "misread." The effect of the individual advertisements which were most definitely misleading, when cumulated with all of the other general representations regarding the safety and handling of the 1986 Corvette, was to instill in Sam an incorrect mindset upon which it was objectively reasonable for him to rely
Furthermore, at the time the advertisements were being disseminated to the public, the concept of an anti-lock braking system was revolutionary. To the Corvette consumer of the mid-1980's, the advent of anti-lock brakes advances was rightly viewed as a panacea to the hazards of driving given GM's advertising campaign. GM exclusively equipped one of its premier vehicles with this revolutionary braking system and marketed the ABS as the only braking system that allowed you to brake hard, yet still maintain control in a curve. In retrospect, this overinflated view of the relative safety of ABS may be a bit naive, but when considered in its temporal context, it was certainly an objectively reasonable one.
The jury determined the GM advertisements were a "substantial factor" in causing Sam's injuries. After a review of the entire record, including the entirety of Sam's testimony, I cannot say the jury's conclusion was manifestly erroneous. As the trial judge pointed out, the jury heard the testimony and was able to draw its own conclusions. In my view, the jury's conclusions are reasonably supported by the record.

Duty
The second element in the "duty/risk" analysis is the determination of whether there is a duty. There is no general duty to speak, but if one does speak, he may be liable for any intentional misrepresentation (fraud) or any negligent misrepresentation. Maraist & Galligan, § 5-7(h). In Devore v. Hobart Mfg. Co., 367 So.2d 836, 839 (La.1979), citing with approval, White v. Lamar Realty, Inc., 303 So.2d 598 (La.App. 2nd Cir.1974), this court recognized "that Civil Code articles 2315 and 2316 ... `afford a broad ambit of protection for persons damaged by intentional and negligent acts of others ...' sufficient to encompass a cause of action for negligent misrepresentation." However, on the facts of the case, the Devore court found the plaintiff had failed to state a cause of action. Id. at 839. Subsequently, in Barrie v. V.P. Exterminators, Inc., 625 So.2d 1007 (La.1993), this court again addressed the issue of negligent misrepresentation. In Barrie, we held a termite inspector could be held liable in tort, to the purchaser of the home with whom he had not contracted, for negligent misrepresentations the inspector had made in his termite infestation report. More precisely, we recognized that a termite inspector's duty to exercise reasonable care in making his inspection and report extends to the parties with whom he had contracted and to the subsequent purchasers of the home with whom he had not contracted. The Barrie court further recognized that the cause of action for negligent misrepresentation has been integrated into the duty/risk, negligence analysis. Just as the Barrie court recognized a duty on the part of the termite inspector not to make negligent misrepresentations in his infestation report, similarly, a manufacturer or vendor has a duty not to make negligent misrepresentations in its advertising, representations which are consequently not protected by the First Amendment.
The protection afforded commercial speech by the First Amendment is indelibly linked to the concomitant duty not to mislead the public. As the Supreme Court pointed out in Central Hudson Gas & Elec. Corp. v. Public Serv. Comm., supra, commercial speech receives the protection of the First Amendment because of the informational function of advertising. Conversely, commercial speech loses the protection of the First Amendment when it is misleading.

Breach
The third step in the "duty/risk" analysis is breach. As noted, supra, the jury was presented with evidence, which was confirmed *667 by the defendant's own experts, which supported its determination GM's advertisements were misleading. Consequently, GM breached its duty. Again, based on a thorough review of the record, I cannot say the jury's conclusion was manifestly erroneous.

Scope of the Risk
The fourth step in the "duty/risk" analysis is the determination of whether the risk of harm was within the scope of protection afforded by the duty breached. The scope of the risk analysis is fairly self-defining, did this plaintiff fall within the scope of the protection of the duty breached? In this case, the defendant disseminated information to the public which had the cumulative effect of suggesting that because of the presence of ABS, it was safe to brake hard while negotiating almost any curve. Here, the plaintiff did exactly what he was led to believe was safe. The plaintiff braked in a curve, when he otherwise would not have braked, because the advertisements reasonably led him to believe it was safe for him to do so.

CONCLUSION
Regarding the jury's role, the trial judge astutely noted, on the record and out of the jury's presence, that the jury could clearly hear the witnesses' responses and could come to their own conclusions based on their evaluations of the witnesses and their testimony. In my view, given the evidence presented to the jury, the jury's determination was supported by the record. For the reasons espoused, the jury's determinations were not manifestly erroneous. Therefore, I would affirm the decision of the court of appeal.
NOTES
[*] Victory, J., not on panel, recused. See Rule IV, Part 2, § 3. Justice Victory, who was originally assigned to this panel, recused himself after oral arguments upon discovering that he, while serving as a trial judge, signed an order allowing an attorney to withdraw from this case. Justice Johnson, who was not assigned to the original panel, was substituted in Justice Victory's place and has, before voting, had the benefit of audio tape recordings of the oral arguments, the parties' briefs, the record, and conference discussions.
[1] 97-C-1653. Plaintiff's writ application was denied. 97-C-1641.
[2] This excerpt of the 1986 Corvette owner's manual was read into the record at trial by an expert witness for the defense.
[3] Plaintiff admitted to partially drinking one beer. Jeffrey Lynn, a witness for the plaintiff, testified that he saw plaintiff have a beer. However, there is no allegation that plaintiff was under the influence of alcohol at the time of the accident. No testimony was adduced at trial which showed that plaintiff had tested positive for alcohol the night of the accident.
[4] John Goodwin enrolled as counsel of record with the understanding that he would not participate in bringing the case to trial.
[1] The appellate panel concluded the trial court erred in granting the JNOV because there was evidence presented to the jury which supported its findings. Although the five member panel was divided on the issue of the JNOV, with one judge believing the trial court was correct in its granting of the JNOV, all the intermediate appellate judges, like the jury and trial judge before them, agreed GM should bear some liability for Sam's injuries.
[2] The same expert also admitted another one of GM's advertisements was confusing. The advertisement in question was found in the Corvette catalog, which according to GM's own disclaimer, was meant to be as comprehensive and factual as possible. In the advertisement, GM described the 1986 Corvette's handling capabilities in mathematical terms, i.e. The advertisement stated a Corvette could stay on the road even when the lateral force on a tight curve reached 3000 pounds, and when deceleration force during braking went above one g. On cross-examination, when the defense expert was asked if the statement was confusing and misleading, he responded that it was.
[3] Jury interrogatory number 1 stated, "Do you find that General Motors Corporation made negligent misrepresentations that were a substantial factor in causing injuries to Samuel Goodwin? Please answer yes or no." After this question, the "yes" blank was checked by the jury foreperson.