836 So.2d 172 (2002)
ETHYL CORPORATION
v.
GULF STATES UTILITIES, INC.
No. 2001 CA 2230.
Court of Appeal of Louisiana, First Circuit.
October 2, 2002.
Writ Denied December 19, 2002.
*174 David L. Guerry, Michael A. Patterson, Jennifer J. Vosburg, Baton Rouge, for PlaintiffsAppellee Ethyl Corporation.
Kenneth P. Carter, W.T. Tete, Eugene G. Taggart, Terrence G. O'Brien, Stephen T. Perrien, New Orleans, John A. Braymer, Baton Rouge, for DefendantAppellant Entergy Gulf States, Inc.
Before: FOIL, FOGG, and KLINE,[1] JJ.
FOGG, J.
On appeal in this action for negligent misrepresentation, the defendant raises issues of subject matter jurisdiction, prescription, and liability. For the following reasons, we affirm, as amended.

FACTS AND PROCEDURAL HISTORY
Ethyl Corporation is a Virginia corporation that, among other things, produces specialty industrial and petroleum chemicals. Ethyl operated a chemical plant in Baton Rouge, Louisiana from 1942 to 1986. The plant was devoted principally to the production of a gasoline additive, tetraethyl lead, commonly known as lead "antiknock" compound.
Operation of the plant required large quantities of both steam and electricity, which Entergy Gulf States, Inc. ("Entergy") (successor by merger to Gulf States Utilities, Inc.) supplied. Entergy is a public utility corporation that generates, transmits and distributes electricity in parts of Texas and Louisiana, and was the sole and monopoly provider of electric power to Ethyl's plant.
Prior to 1981, Entergy served Ethyl's electric requirements directly from a facility known as Louisiana Station, which was comprised of two units: Louisiana Station No. 1 and Louisiana Station No. 2. Louisiana Station 1 served only two customers, Ethyl and Exxon Corporation. The steam and the majority of the electricity consumed by these companies came from Louisiana Station 1, which produced steam and cogenerated electricity and was unregulated by the Louisiana Public Service Commission ("LPSC"). Both Ethyl's and Exxon's electric needs exceeded the amount of electricity that could be generated by Louisiana Station 1. Therefore, Entergy provided supplemental electricity from Louisiana *175 Station 2, a generating station fueled by natural gas and regulated by the LPSC. Electricity, transmitted at 13.8 kV, was delivered directly from buses at Louisiana Station through underground feeders to these customers. Thirteen Ethyl-owned 13.8 kV underground cables were directly connected to Entergy's buses at Louisiana Station.
In the mid-1970's, Entergy advised Ethyl that it intended to convert its transmission system from 13.8 kV to 230 kV, a less expensive way to move more power. In early 1975, Entergy informed Ethyl that Louisiana Station 2, which was approximately forty-five years old, would be shut down necessitating the construction of new electrical facilities to supply Ethyl's requirements. Representatives of Ethyl and Entergy engaged in numerous conversations and meetings to discuss the various methods of meeting Ethyl's electric requirements, and Entergy conducted a study of alternatives for service. In April of 1976, Entergy produced a report entitled "Alternative Electric Power Sources For Steam Products Customers At Louisiana Station As Steam Demand Is Reduced And Gas Contract Expires For LA STA. Units 7, 8, And 9" ("Alternatives Report"), and discussed parts of the report with Ethyl and Exxon. Entergy continually represented to Ethyl that its only source of reliable power was to take power from Entergy's new 230 kV system, then reduce the voltage to 13.8 kV for use at Ethyl's plant through a step down substation that would have to be constructed.
In March of 1979, Entergy informed Ethyl that it would no longer be able to supply the total of Ethyl's requirements from the 13.8 kV buses at Louisiana Station after January 1, 1981. On August 28, 1979, representatives of Ethyl and Entergy met and reached an agreement as to quantities and delivery of regulated electric service through an electric substation to be built by Ethyl. A contract reflecting this agreement was executed on January 1, 1980.
Ethyl built the ECORP substation, which became operational in March of 1981 and was used through 1985 to receive electric service from Entergy's facilities. Ethyl ceased to manufacture chemicals at its facility in August of 1985, after the Environmental Protection Agency severely limited the use of lead additives in gasoline. Ethyl dismantled the ECORP substation in 1987 and sold it as scrap.
On December 2, 1986, Ethyl filed suit against Entergy, seeking to recover the cost of the ECORP substation as well as compensation for Entergy's alleged unauthorized use of the ECORP facility. It asserted claims of unjust enrichment and intentional or negligent misrepresentation.[2] Entergy responded by raising exceptions of lack of subject matter jurisdiction and prescription, which were denied by the trial court. The matter proceeded to trial, and after presentation of the plaintiff's case, the defendant moved for a directed verdict as to the plaintiff's claim for unjust enrichment. The trial court granted the motion and dismissed the claim for unjust enrichment.
After hearing the matter, the jury returned a verdict in favor of Ethyl and against Entergy on Ethyl's claim of negligent misrepresentation, awarding the sum of $4,146,229 in damages and assessing 75% of the fault to Entergy and 25% to Ethyl. On April 5, 2001, the trial court rendered judgment in accordance with the *176 jury verdict as well as interest from the date of judicial demand. Entergy appeals.

SUBJECT MATTER JURISDICTION
Initially, Entergy asserts that the district court erred in overruling its declinatory exception raising the objection of lack of subject matter jurisdiction. Entergy asserts that Ethyl's claim is either a rate matter or a service matter, both of which are beyond the original jurisdiction of the district court and within the jurisdiction of the LPSC. Ethyl asserts that its cause of action is a tort claim for negligent misrepresentation properly within the jurisdiction of the district court.
Louisiana Constitution article V, § 16 vests the district courts with "original jurisdiction of all civil and criminal matters," unless there is other jurisdictional authorization in the Constitution. LSA-Const. art. IV, § 21(B) establishes the LPSC as an administrative agency within the executive branch and grants the LPSC the power to "regulate all ... public utilities" and "such other regulating authority as provided by law."[3] Specifically, the LPSC has original jurisdiction over subject matters that principally involve the right to fix and regulate the rates to be charged and the services to be furnished by a public utility. LSA-R.S. 45:1163. The legislature has never "provided by law" for the LPSC to exercise jurisdiction over other subject matters and areas of litigation in which public utilities are involved. Central Louisiana Elec. Co., Inc. v. Louisiana Public Service Com'n, 601 So.2d 1383 (La. 1992) (hereinafter "CLECO"). Therefore, the district courts do not have jurisdiction over matters involving the fixing and regulating of rates and services by a public utility, and the LPSC does not have jurisdiction over other subject matters and areas of litigation in which public utilities are involved, such as tort actions and contract disputes. CLECO, 601 So.2d at 1386.
To resolve the issue of whether the LPSC or the district court has subject matter jurisdiction over a matter, it is necessary to initially determine the relief demanded by both parties. CLECO, 601 So.2d at 1386. In Daily Advertiser v. Trans-La, a Div. of Atmos Energy Corp., 612 So.2d 7, 16 (La.1993), the supreme court explained that "the manner in which plaintiffs couch their claims does not automatically vest jurisdiction in the district court; rather, the nature of the relief demanded is dispositive." Where the essence of a claim is that a utility has charged too much for a service, jurisdiction lies with the LPSC; however, where the essence of the claim is that the utility did something else to injure the plaintiff, the claim is for damages, and jurisdiction lies with the district court. Daily Advertiser, 612 So.2d at 16. See Fremin's Food & Furniture, Inc. v. Teche Electric Cooperative, Inc., 545 So.2d 998 (La.1989) (finding dispute between electric cooperative and its members regarding electric service within LPSC's jurisdiction and reserving legal rights, if any, to damages); Milstead v. Louisiana Power and Light Co., 581 So.2d 1085 (La.App. 2 Cir.), writ denied, 587 So.2d 697 (La.1991) (dismissing the plaintiff's contractual claim which alleged rate overcharges and reserving plaintiff's right to assert claim for damages arising out of contract in district court); O'Niell v. Louisiana Power & Light Co., 558 So.2d *177 1235 (La.App. 1 Cir.1990) (holding that courts lack jurisdiction to alter rates or charges established by the LPSC and finding jurisdiction over, and adjudicating, claims requiring interpretation of certain contracts for electrical service); Edwards v. Louisiana Power and Light Co., 439 So.2d 442 (La.App. 1 Cir.1983) (finding jurisdiction with the LPSC over dispute concerning charges in excess of tariff and remanding the plaintiff's claim for damages to district court).
Ethyl claims that Entergy, through the dissemination of false or incomplete information, caused it to conclude that the construction the ECORP substation at a cost of $8,000,000 was essential to the existence of its business. Essentially, Ethyl asserts Entergy misled it into agreeing to construct the ECORP substation. Clearly, Ethyl's claims rely on factual allegations that are separate from the rates and services over which the LPSC has jurisdiction. Rather, Ethyl's claim is a tort action over which the district court has subject matter jurisdiction. The trial court correctly denied Entergy's exception of lack of subject matter jurisdiction.

PRESCRIPTION
Entergy next contends that the trial court erred in denying its exception of prescription as to Ethyl's claim for negligent misrepresentation. By its claim for negligent misrepresentation, Ethyl alleges misrepresentation and damage prior to 1980, leading to its expenditure of $8,000,000 to construct the ECORP substation, which went into service on April 1, 1981. Ethyl filed its original petition on December 4, 1986 and its seventh amended petition, which added a claim for negligent misrepresentation, on July 21, 1999. Entergy asserts that, because these pleadings were filed more than one year after the alleged delictual acts and alleged damage, Ethyl's claims are prescribed on their face pursuant to LSA-C.C. art. 3492.
Ethyl concedes that its claim is prescribed on the face of the petition, but asserts the trial court correctly applied the doctrine of contra non valentem. It asserts that it did not know of its claim for negligent misrepresentation until November 9, 1987, when it received documents in discovery that previously had been "concealed."
The doctrine of contra non valentem prevents the running of liberative prescription where the cause of action is not known or reasonably knowable by the plaintiff. Cole v. Celotex Corp., 620 So.2d 1154 (La.1993); Brunett v. Dep't of Wildlife and Fisheries, 96-0535, 96-0536 (La. App. 1 Cir. 12/20/96), 685 So.2d 618, writ denied, 97-0186 (La.3/14/97), 689 So.2d 1385.
In April of 1976, Entergy produced its Alternatives Study. It is undisputed that it presented Ethyl with the first eighteen pages of that study and withheld the last four pages that contained the final conclusions and recommendations for future service to Ethyl. It is also undisputed that the information contained in the four withheld pages differed substantially from other information provided by Entergy to Ethyl concerning Ethyl's continued electric service. In November of 1987 pursuant to a discovery request, Ethyl received the previously withheld pages. This information raised questions as to the accuracy of the assertion Entergy made to Ethyl throughout the late 1970's that the building of a substation was the only feasible method to serve Ethyl's electric needs.
Clearly, Ethyl did not have actual or constructive knowledge of the cause of action at the time the negligent misrepresentations are alleged to have been made, and their first knowledge occurred in November *178 of 1987. Consequently, we cannot say that the trial judge's determination that Ethyl's inaction was reasonable was in error.
Furthermore, LSA-C.C.P. art. 1153 provides: "When the action or defense asserted in the amended petition or answer arises out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of filing the original pleading." Therefore, although Ethyl filed its claim for negligent misrepresentation more than one year after it acquired knowledge of the alleged act of misrepresentation, Ethyl's seventh amended petition alleging negligent misrepresentation related back to its original petition and was timely. The trial court did not err in denying the exception of prescription.

NEGLIGENT MISREPRESENTATION
Entergy asserts that the judgment in favor of Ethyl on the claim of negligent misrepresentation is contrary to law and evidence. The tort of negligent misrepresentation pertains to failure to provide correct information about existing facts. In Louisiana, negligent misrepresentation cases are evaluated using the duty-risk analysis, Daye v. General Motors Corp., 97-1653 (La.9/9/98), 720 So.2d 654, which is employed on a case-by-case basis. Barrie v. V.P. Exterminators, 625 So.2d 1007 (La.1993). The plaintiff must prove that the conduct in question was a cause-in-fact of the resulting harm, the defendant owed a duty of care to the plaintiff, the requisite duty was breached by the defendant, and the risk of harm was within the scope of protection afforded by the duty breached. Smith v. Roussel, XXXX-XXXX (La.App. 1 Cir. 6/22/01), 809 So.2d 159.
Entergy admits that it had a duty to act as a reasonable person under the circumstances in negotiating this transaction. Entergy admits that, during the negotiations leading up to the contract of January 1, 1980, "it had a duty to exercise reasonable care not to supply false or incorrect information to Ethyl" and that, once it supplied statements of fact to Ethyl, it undertook the duty to exercise reasonable care to assure that the factual data it supplied, "such as technical engineering data and cost estimates, were correct as statements of fact." See Devore v. Hobart Manufacturing Co., 367 So.2d 836 (La. 1979). Entergy asserts, however, that a failure to disclose complete information and the act of advocating a resolution most favorable to it do not constitute a breach of that duty.
Breach of duty is a question of fact, Mundy v. Dep't of Health & Human Resources, 620 So.2d 811 (La.1993), subject to the manifest error standard of review. Stobart v. State through Dep't of Transp. & Dev., 617 So.2d 880 (La.1993). "Generally, breach of a duty is the failure to exercise reasonable care under the circumstances." FRANK L. MARAIST & THOMAS C. GALLIGAN, LOUISIANA TORT LAW § 6-1, at 139 (1996).
A review of the record demonstrates that the jury did not manifestly err in finding Entergy breached its admitted duty to act as a reasonable person. Entergy was the monopoly provider of electricity, with the power to shut down Ethyl by providing less power than Ethyl required if Ethyl did not agree to utilize a substation. Such circumstances are not an ordinary arms length negotiation. Furthermore, the trial testimony of Edward Trahan, an electrical engineer employed by Ethyl, and the testimony and report of Whitfield A. Russell, Ethyl's expert witness, support the conclusions that the construction *179 of the substation by Ethyl was not necessary to the continuation of sufficient electric service and that Entergy did not provide correct information to Ethyl.
Once a duty and a breach thereof have been established, the trier of fact must determine if the breach is the legal cause of the plaintiff's injuries. The cause-in-fact inquiry is whether the harm to Ethyl would have occurred but for Entergy's misrepresentation or omission of material facts to Ethyl. Perkins v. Entergy Corp., 00-1372 (La.3/23/01), 782 So.2d 606. Causation is a question of fact. Brumfield v. Guilmino, 93-0366 (La.App. 1 Cir. 3/11/94), 633 So.2d 903, writ denied, 94-0806 (La.5/6/94), 637 So.2d 1056. The trier of fact's determinations are entitled to great weight and cannot be disturbed absent manifest error or unless clearly wrong. LaBove v. Raftery, XXXX-XXXX (La.11/28/01), 802 So.2d 566; Rosell v. ESCO, 549 So.2d 840 (La.1989). The issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Stobart, 617 So.2d at 882. An appellate court should not substitute its opinion for the conclusions made by the trial court, which is in a unique position to see and hear the witnesses as they testify. In re: A.J.F., 00-0948 (La.6/30/00), 764 So.2d 47.
Entergy asserts that Ethyl's reliance on the Alternatives Study and the information provided by Entergy concerning that study is not justifiable in view of Ethyl's knowledge that Entergy had made only a very preliminary study. Entergy avers that it was incumbent upon Ethyl to do its own studies and arrive at its own conclusions, and the causal link between any misrepresentation by Entergy in April of 1976 and any pecuniary loss to Ethyl is weakened by the fact that Ethyl continued to make its own studies, proposals, and independent investigations of various alternatives.
The record reflects that Ethyl relied totally on Entergy's statements that a new substation was its only source of adequate electric service in the future. Ethyl conducted a study of substation options only after Entergy advised it that a new substation had to be built. The only other study Ethyl conducted concerned cogeneration. The record also reflects that the decision by Ethyl to build ECORP was predicated upon statements of false information and non-disclosure of additional correct information by Entergy. Therefore, it follows that had Entergy not misrepresented to Ethyl that the only source of electricity to serve its plant was from the 230 kV system via a substation, Ethyl would not have incurred the expense to construct the facility. Considering the above, the factual conclusion of the jury that Entergy did not provide correct information to Ethyl during their negotiations in the mid-to-late 1970's is supported by the evidence and is not manifestly erroneous.

COMPARATIVE NEGLIGENCE
The appellant also contends the trial court erred in charging the jury with the doctrine of comparative negligence rather that the doctrine of contributory negligence in this case. A pure comparative fault system was adopted by the Louisiana legislature in 1979 by Act 431, which became effective on August 1, 1980. Section 4 of Act 431 provides that the Act does not apply to claims arising from events occurring before the Act's effective date. Relying on Cole v. Celotex, 599 So.2d 1058 (La.1992), Entergy avers that, because the conduct constituting the tort occurred prior to the effective date of Act 431 and resulted in the manifestation of damages after the Act's effective date, pre-act contributory negligence law applies. *180 We find that Entergy's reliance on Cole is misplaced.
In Cole, the Louisiana Supreme Court reviewed the laws applicable to occupational disease cases based on injuries resulting from the occupational inhalation of asbestos. In that case, three former refinery workers filed suit in 1987, claiming the failure by some defendants to provide a safe workplace during their employment between 1945 and 1976 caused them to contract asbestosis. The court in Cole addressed the issue of whether the Louisiana Comparative Fault Law, enacted in 1979, applied retroactively to the case. Citing the "uniqueness" of asbestosis cases and pointing to the "lengthy temporal separation between the tortious conduct and the appearance of injury," the court held that the law in effect during the time of the plaintiffs' employment, that is contributory negligence, governed their 1987 actions, rather than the comparative fault principles established by the 1979 Louisiana Legislature. Cole, 599 So.2d at 1058.
Subsequently, in Walls v. American Optical Corp., 98-0455 (La.9/8/99), 740 So.2d 1262, the court limited the application of Cole by declining to extend Cole's "tortious exposures doctrine" to a wrongful death action arising from the decedent's exposure from 1964 to 1970 to silica dust that is created during sandblasting and his subsequent death in 1995 due to silicosis.
By asserting the applicability of Cole to the instant case, Entergy seeks the application of that jurisprudence to factual scenarios other than those involving harmful inhalants. For the reasons stated below by the court in Walls, we decline to extend that analysis to a cause of action for negligent misrepresentation.

Cole established the "exposure theory" for determining the applicable law within the context of the direct tort action and survival action. "[G]eneral expressions, in every opinion, are to be taken in connection with the case in which those expressions are used." Landgraf, 511 U.S. at 265, 114 S.Ct. at 1497, 128 L.Ed.2d at 252. Therefore, Cole's rationale cannot apply to the instant case involving a wholly distinct cause of action for wrongful death.
Walls, 740 So.2d at 1273. Rather, the issue of whether comparative negligence applies to the instant case turns on a determination of when the plaintiff's cause of action for negligent misrepresentation accrued
Under Louisiana law, a cause of action accrues when the party has the right to sue. Louette v. Security Industrial Ins. Co., 361 So.2d 1348 (La.App. 3 Cir.), writ denied, 364 So.2d 564 (La.1978). "For a negligence cause of action to accrue, three elements are required: fault, causation and damages." Cole, 599 So.2d at 1063, n. 15, citing Owens v. Martin, 449 So.2d 448 (La.1984). The plaintiff in a negligent misrepresentation action has no damage until it acts upon the misrepresentations. Whether the plaintiff's cause of action accrued prior to August 1, 1980 depends upon when the plaintiff's injury occurred. Walls, 740 So.2d at 1270.
Ethyl's claim of negligent misrepresentation is based on Entergy's failure to provide it with a complete report in the late 1970's and its continual exclusion of the remaining parts of that report from Ethyl through the time Ethyl agreed to construct the ECORP substation in 1979 and executed a contract for electric service on January 1, 1980. However, the trial court determined that the damages and the cause of action accrued with completion of the ECORP substation in March of 1981, after the effective date of the amendment. The determination of when a cause of action accrues is a fact question. Abadie *181 v. Metropolitan Life Ins. Co., 00-344 and 00-856 (La.App. 5 Cir. 3/28/01), 784 So.2d 46, writs denied, XXXX-XXXX, XXXX-XXXX, XXXX-XXXX, XXXX-XXXX, XXXX-XXXX, XXXX-XXXX, XXXX-XXXX (La.12/14/01), 804 So.2d 642-644, cert. denied sub nom Territo v. Adams, 535 U.S. 1107, 122 S.Ct. 2318, 152 L.Ed.2d 1071 (2002). We find no manifest error in the trial court's determination that the cause of action accrued in March of 1981. Therefore, the trial court properly gave the jury a charge for comparative negligence.

INTEREST
Finally, the appellant asserts the trial court erred in assessing interest from the date of judicial demand rather than the date Ethyl first made its claim for negligent misrepresentation. Louisiana is a fact-pleading jurisdiction; therefore, a party may be granted any relief that the facts constituting the claim would support. Mehta v. Baton Rouge Oil Co., Inc., 99-1773 (La.App. 1 Cir. 9/22/00), 768 So.2d 243.
In its original petition, Ethyl alleged, in pertinent part, that Entergy planned to close part of Louisiana Station and that the only viable option for continued electric service for Ethyl was for it to construct a substation. These allegations are insufficient to grant relief for a claim for negligent misrepresentation. Therefore, the trial court erred in assessing interest from the filing date of the original petition.
However, in its third amending petition, Ethyl reiterated the above allegations and added a claim identified as intentional misrepresentation, alleging that Entergy "intentionally concealed ... alternatives" and "the availability of other options to provide power to Ethyl's plant" from Ethyl. The facts asserted in support of this new cause of action are sufficient to grant relief for a cause of action for negligent misrepresentation. Therefore, we will amend the judgment to award interest for the date the third amending petition was filed, April 25, 1988. See Livingston v. Southern Scrap Material Co., Inc., 486 So.2d 210 (La.App. 1 Cir.1986).

CONCLUSION
For the foregoing reasons, the judgment of the trial court is amended to award interest from April 25, 1988, and affirmed, as amended. Costs are assessed against Entergy Gulf States, Inc.
AFFIRMED, AS AMENDED.
NOTES
[1] Retired Judge William F. Kline, Jr. is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] Although other claims were made during the years leading up to trial, only these were presented to the jury.
[3] In its entirety, Section 21(B) provides:

(B) Powers and Duties. The commission shall regulate all common carriers and public utilities and have such other regulatory authority as provided by law. It shall adopt and enforce reasonable rules, regulations, and procedures necessary for the discharge of its duties, and shall have other powers and perform other duties as provided by law.