# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
April 8, 2011

No. 09-30714

Lyle W. Cayce
Clerk

EDWARD J. SCHAUMBURG,

Plaintiff-Appellant

v.

STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY;
STATE FARM LIFE INSURANCE COMPANY;
STATE FARM FIRE & CASUALTY COMPANY;
STATE FARM GENERAL INSURANCE COMPANY,

Defendants-Appellees

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:07-CV-9839

Before KING, WIENER, and DENNIS, Circuit Judges.

PER CURIAM:[*]

Plaintiff-appellant Edward J. Schaumburg was an independent insurance agent for defendants-appellees State Farm Mutual Automobile Insurance Company, State Farm Life Insurance Company, State Farm Fire & Casualty Company, and State Farm General Insurance Company (collectively "State Farm") for more than twenty years.  Soon after his retirement, he

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

brought suit against State Farm, claiming breach of contract, breach of the duty of good faith and fair dealing, negligent misrepresentation, and fraud. The district court granted State Farm's motion for summary judgment and dismissed all of Schaumburg's claims. We reverse the dismissal of the negligent misrepresentation claim, and affirm the dismissal of the other claims.

## I.  FACTS & PROCEEDINGS

### A.  Facts

Schaumburg was a State Farm insurance agent from 1981 until he retired in 2006. In 1981, Schaumburg entered into a written contract, the State Farm Agent's Agreement (hereinafter "Agreement"), to solicit applications for State Farm insurance as an independent contractor, not as an employee. Either party could terminate the Agreement at any time by furnishing written notice to the other. The Agreement was silent as to any required procedures for or restrictions on Schaumburg's ability to relocate his office, other than stating that State Farm "anticipate[d] that in the location or relocation of [Schaumburg's] office [Schaumburg would] not unduly infringe on the established office location of any other agent."

Schaumburg worked out of his office in Chalmette, Louisiana from 1981 until August 2005, when that office and the surrounding area were destroyed by Hurricane Katrina. Schaumburg then set up a temporary office in Metairie, Louisiana. He was not required to sign a new contract or to relinquish his book of business while he was temporarily located in Metairie. According to Schaumburg, he did not want to stay in Metairie because it was crowded with other State Farm agents who had temporarily moved there after Katrina. He became interested in moving to Belle Chasse, Louisiana.

In September 2005, Schaumburg attended a meeting in Baton Rouge, Louisiana for State Farm agents. He claims that Timothy McFadden, State

No. 09-30714

Farm's Vice-President of Agency for Louisiana, told the agents in attendance that they would have to sign new contracts with State Farm if they wanted to relocate their agencies.  Another topic addressed at the Baton Rouge meeting was a temporary special retirement plan that State Farm was making available to its agents, modifying its Early Notification Program (ENP) to allow agents to receive termination payments calculated on the basis of the commissions they had earned prior to Hurricane Katrina, rather than the lower commissions they would likely receive after Katrina.  This favorable calculation of termination payments was made available only to agents who accepted the deal and agreed to retire by December 31, 2005.  (That is, the date on which an agent entered into an agreement to retire had to be no later than the end of 2005; the actual date of retirement could be later.)  A State Farm employee, Tracey Cemo, described the Baton Rouge meeting as follows: "[the agents] were told that if they moved locations that they would have to sign a new contract, but they were also told that if they were to retire, that they would have special packages set up if they decided to take early retirement."

According to Schaumburg, signing a new contract in order to relocate was not a mere formality, but would have had a significant financial effect on him.  The record includes testimony from other State Farm agents that the new contracts gave agents lower commissions and retirement benefits compared to the older contracts such as the Agreement that Schaumburg signed with State Farm in 1981.

In his deposition, McFadden denied having told the agents that they would have to sign new contracts before relocating.  Furthermore, McFadden denied that it was State Farm's policy, between August 2005 and the end of 2005, to require agents to sign new contracts before they could relocate. McFadden said that at that time, if an agent wanted to relocate his office

3

from Chalmette to Belle Chasse, the agent could do so without signing a new contract.

After learning that a State Farm agent in Belle Chasse was retiring, Schaumburg became interested in the possibility of taking over the retiring agent's business. In November or December 2005, according to Schaumburg, Theresa Hollander, a State Farm Agency Field Executive, told him that, if he took over the existing agency office in Belle Chasse, he would have to sign a new contract and would not be able to bring his existing book of clients with him. In her deposition, Hollander denied having talked with Schaumburg about these topics.

As a result of these meetings with McFadden and Hollander, Schaumburg contends, State Farm effectively left him with only three options: (1) sign a new contract in order to relocate his existing business to Belle Chasse or anywhere else; (2) sign a new contract and give up his existing book of business in order to take over the retiring agent's office in Belle Chasse[1]; or (3) retire under the special post-Katrina ENP. In December 2005, Schaumburg signed an agreement to retire under the special ENP, effective December 31, 2006. According to Schaumburg, his belief that he would be unable to move his business to Belle Chasse without signing a new contract was "a major factor in my decision-making process" leading to the decision to retire. When he retired at the end of 2006, Schaumburg was 62 years old. He claimed that he had previously planned to continue working "probably ten years" from January 2005. Thus, his decision to retire rather

---

[1] Schaumburg's brief often fails to clearly distinguish between these first two alternatives. He sometimes complains that State Farm required him to give up his existing book of business in order to relocate his office at all. However, the evidence in the record does not support this contention. Rather, the record contains evidence that (1) McFadden told Schaumburg he would have to sign a new contract in order to *relocate* his office, and (2) Hollander told Schaumburg he would have to sign a new contract *and* give up his existing book of clients if he *took over* the retiring agent's business in Belle Chasse.

4

No. 09-30714

than go on working allegedly resulted in the loss of roughly eight years' worth of income.

In November 2006, Schaumburg learned that another agent had relocated to Belle Chasse without being required to sign a new contract. That news prompted Schaumburg to file this suit against State Farm.

## B. Proceedings

Schaumburg's complaint asserted claims under Louisiana law for breach of contract, breach of the duty of good faith and fair dealing, negligent misrepresentation, and fraud. He alleged that State Farm had breached the Agreement by prohibiting him from relocating without signing a new contract. He also alleged that State Farm had either negligently or intentionally misrepresented its own policy governing the relocation of agents. He further alleged that State Farm's actions caused him to lose revenue and resulted in a reduction of his retirement benefits. State Farm denied liability and moved for summary judgment.

The district court granted State Farm's motion for summary judgment and dismissed all of Schaumburg's claims with prejudice. The district court dismissed the claims of breach of contract and breach of the duty of good faith and fair dealing because, "assuming the Plaintiff's factual allegations to be true, the Court does not find that the Defendants have breached any terms of the contract." The court reasoned that the Agreement is silent as to whether an agent may relocate without signing a new contract or giving up his existing book of clients; therefore, "the Plaintiff does not identify any terms of the contract violated by State Farm's purported action."

The district court dismissed the claims of negligent misrepresentation and fraud because the court considered that "[t]here is no evidence that the Plaintiff was provided with incorrect information. Although State Farm later instituted procedures for the relocation of agents without a new client book or

5

contract, there is no evidence that the information that Plaintiff received was incorrect at the time that it was provided." The court reasoned that because State Farm had not supplied incorrect information or misrepresented the truth, it could not be liable for negligent misrepresentation or fraud.[2] Schaumburg timely filed a notice of appeal.

## II. ANALYSIS

### A. Standard of Review

We review a district court's grant of a motion for summary judgment de novo. *Wiley v. State Farm Fire & Cas. Co.*, 585 F.3d 206, 210 (5th Cir. 2009). The evidence and inferences from the record are viewed "in the light most favorable to the nonmovant." *Minter v. Great Am. Ins. Co. of N.Y.*, 423 F.3d 460, 465 (5th Cir. 2005). Summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party, here State Farm, has the burden of showing that there is no genuine dispute of material fact and that it is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

### B. Breach of Contract

Schaumburg claims that State Farm breached the Agreement by "[r]efusing to allow [him] to relocate to Belle Chasse" without signing a new

---

[2] Schaumburg also assserted a claim of tortious interference with contract, which the district court dismissed because Schaumburg himself conceded that "recovery for tortious interference with contract is not available based on the facts and law at issue in the instant case." On appeal, Schaumburg does not contest the district court's dismissal of this claim.

contract. Appellant's Br. 18-19.[3] We must determine, therefore, whether the Agreement gave Schaumburg a right to relocate his office and, if so, whether State Farm breached that right.

The Agreement states:

> [State Farm] anticipate[s] that in the location or relocation of [Schaumburg's] office [Schaumburg] will not unduly infringe on the established office location of any other agent. [Schaumburg] agrees that [he] will not establish any office in addition to [his] principal office without prior approval of [State Farm].

Schaumburg contends that this provision gave him a right to relocate his office, subject to only two specified conditions: that his doing so must not "unduly infringe on" another agent's established location and that he must not establish any additional offices without prior approval. State Farm counters that this provision did not *affirmatively* require it to allow Schaumburg to relocate to any particular area under any conditions, and that the absence of an explicit right "simply means that the right does not exist." Appellees' Br. 30-31.

Assuming for the sake of argument that this provision did create a right of relocation, Schaumburg still has not presented any evidence that State

---

[3] Schaumburg asserts in his brief that State Farm also refused to allow him to relocate *while retaining his book of business*. But, in his deposition, Schaumburg testified that Hollander told him he would have to give up his book of business only if he wanted to *take over the retiring agent's business* in Belle Chasse. There is no testimony or evidence in the record that anyone ever told Schaumburg that he would have to give up his book of business if he simply relocated his own office.

What Schaumburg did testify to, however, was that McFadden announced to all of the agents at the Baton Rouge meeting that they would have to sign new contracts if they relocated their offices. Therefore, we will only address Schaumburg's arguments that are based on State Farm's alleged refusal to let him relocate his office without signing a new contract.

Schaumburg has not identified any provision of the Agreement that even arguably gave him a right to take over another agent's business while also keeping his existing book of business; therefore, Hollander's alleged statement to him on this matter cannot have amounted to a breach of contract.

No. 09-30714

Farm prevented him from exercising this contractual right. Schaumburg claims that State Farm "refused" to allow him to relocate without signing a new contract. However, McFadden's alleged announcement at the Baton Rouge meeting does not in and of itself constitute a breach of the Agreement. State Farm did not take any action contrary to the terms of the Agreement; neither did it fail to perform any obligation required by the Agreement. Neither did Schaumburg ever make any affirmative attempt to relocate his office, so State Farm never could have breached the Agreement by interfering with his relocation.

At most, Schaumburg could argue that the statement attributed to McFadden was an anticipatory breach of contract, conveying that State Farm intended to impose a condition on Schaumburg in the future that would violate his rights under the Agreement.[4] However, an anticipatory breach must be "a refusal to perform" a contractual obligation. *Andrew Dev. Corp. v. W. Esplanade Corp.*, 347 So. 2d 210, 213 (La. 1977). "Where a party refuses and does not merely fail or neglect to comply with his contractual obligation, his refusal constitutes an active breach of the contract which relieves the other party of the obligation of continuing to perform under the contract." *Id.* at 212-13. "The princip[al] thesis of this doctrine is that an obligee has a cause of action when an obligor's acts or omissions reduce his ability to execute, or signify his intent to repudiate, a contractual obligation." *Fairfield Dev. Co. v. Jackson*, 438 So. 2d 664, 671 (La. App. 2d Cir. 1983).

McFadden's announcement at the Baton Rouge meeting, as described by Schaumburg, did not signify an intent to repudiate a contractual obligation. At most, the announcement can be understood as signifying State

---

[4] Louisiana recognizes the concept of anticipatory breach. *See, e.g.*, *Marek v. McHardy*, 101 So. 2d 689, 695 (La. 1958) ("[W]e deduce that an anticipatory breach of contract is actionable in Louisiana.").

8

No. 09-30714

Farm's intention to *terminate* Schaumburg's contract if he relocated his business without first signing a new contract. However, that is not the same as an intention to *breach* the contract, because the Agreement permitted both Schaumburg and State Farm to terminate it at will.[5] Therefore, an announcement of State Farm's intention to terminate the contract if Schaumburg relocated his office without first signing a new contract — if such an announcement was made — would not amount to an anticipatory breach. *See Fullerton v. Scarecrow Club, Inc.*, 440 So. 2d 945, 949 (La. App. 2d Cir. 1983) ("[B]ecause the defendant has *not* breached the contract or indicated an intent to do so, [the plaintiff] may not avail himself of the doctrine of anticipatory breach to seek remedies in contract against the breaching party . . . ."). We affirm the district court's dismissal of Schaumburg's claim of breach of contract.

## C. Breach of the Duty of Good Faith and Fair Dealing

Schaumburg claims that State Farm's actions amounted to a breach of the obligation of good faith and fair dealing. Under Louisiana law, every contract implies an obligation of good faith performance. *See* La. Civ. Code art. 1983 ("Contracts must be performed in good faith."). A breach of the duty of good faith and fair dealing requires a breach of a contract. "In order to

---

[5] The Agreement declared: "You or State Farm have the right to terminate this Agreement by written notice delivered to the other or mailed to the other's last known address." Schaumburg argues that the Agreement permitted State Farm to terminate agents only for cause, not at will, because it provided for a review procedure: "In the event we terminate this Agreement, you are entitled upon request to a review in accordance with the termination review procedures approved by the Boards of Directors of the Companies, as amended from time to time." However, courts have consistently held that this particular contractual language does not limit State Farm's right to terminate agents at will. *E.g., Appling v. State Farm Mut. Auto. Ins. Co.*, 340 F.3d 769, 778 (9th Cir. 2003) ("On the contrary, the Termination Review Provision suggests State Farm's desire to prevent arbitrary terminations without limiting its legal entitlement to terminate at-will by written notice."); *Olander v. State Farm Mut. Auto. Ins. Co.*, 317 F.3d 807, 810-12 (8th Cir. 2003) (en banc). Schaumburg's brief cites no cases in which courts have interpreted this contractual language as preventing at-will termination.

No. 09-30714

establish that [State Farm] breached an implied covenant of good faith in connection with [the Agreement], [Schaumburg is] required to prove that [State Farm] violated that agreement with a dishonest or morally questionable motive." *Barbe v. A.A. Harmon & Co.*, 705 So. 2d 1210, 1220 (La. App. 4th Cir. 1998). *See also Fertel v. Brooks*, 832 So. 2d 297, 306 n.12 (La. App. 4th Cir. 2002) ("Bad faith is not the mere breach of faith in not complying with a contract, but a designed breach of it from some motive of interest or ill will."). Regardless of what State Farm's motives may have been, Schaumburg cannot show that State Farm breached the duty of good faith and fair dealing because he has failed to show that the company breached any contractual obligation. Accordingly, we affirm the district court's dismissal of this claim.

## D.  Negligent Misrepresentation

Schaumburg contends that State Farm committed negligent misrepresentation because when McFadden allegedly stated at the Baton Rouge meeting in September 2005 that agents would be required to sign new contracts before they could relocate their offices, he misinformed them about State Farm's then-existing policy regarding relocation.[6] Under Louisiana law, the tort of negligent misrepresentation has three elements: "(1) there must be a legal duty on the part of the defendant to supply correct information; (2) there must be a breach of that duty; and (3) the breach must have caused damages to the plaintiff." *Cypress Oilfield Contractors, Inc. v.*

---

[6] Schaumburg's brief also seems to argue that Hollander's telling him that he would have to give up his existing book of business in order to take over the retiring agent's business in Belle Chasse amounted to negligent misrepresentation (or perhaps fraud). However, Schaumburg has not identified any evidence in the record that this statement by Hollander was an inaccurate description of State Farm's then-existing policies toward its agents. Because there is no evidence that this statement was incorrect, Schaumburg's claims of negligent misrepresentation and fraud cannot be predicated on it. Accordingly, we focus on McFadden's alleged statement at the Baton Rouge meeting.

No. 09-30714

*McGoldrick Oil Co.*, 525 So. 2d 1157, 1162 (La. App. 3d Cir. 1988) (citing La. Civ. Code arts. 2315, 2316; *Dohmann v. United Gas Pipe Line*, 457 So. 2d 307 (La. App. 3d Cir. 1984); *Beal v. Lomas & Nettleton Co.*, 410 So. 2d 318 (La. App. 4th Cir. 1982)).[7]

The district court's dismissal of Schaumburg's negligent misrepresentation claim was based on the second of these three elements: the court considered that there was "no evidence that the information that the Plaintiff received was incorrect at the time that it was provided." However, it is undisputed in the record that at the time of the Baton Rouge meeting, State Farm's policy was that agents were *not* required to sign new contracts before relocating their offices. McFadden testified to this in his deposition. And, because Schaumburg is the nonmoving party on summary judgment, we must accept his version of what McFadden said at the Baton Rouge meeting: that agents *were* required to sign new contracts before relocating their offices. Therefore, viewing the record in the light most favorable to Schaumburg, the evidence is sufficient to permit a rational trier of the facts to find that McFadden did provide Schaumburg with information that was incorrect at the time it was provided. Accordingly, contrary to the district court's conclusion, there is a genuine factual dispute regarding the second element of negligent misrepresentation.

Consequently, we must go on to consider the remaining elements of the tort. We will next address the first element: whether, under the circumstances, State Farm had a duty to supply correct information to Schaumburg. "Louisiana negligent misrepresentation cases are evaluated

---

[7] The Louisiana Supreme Court's "jurisprudence has . . . limited negligent misrepresentation tort theory to cases wherein contract or fiduciary relationship exists." *Daye v. Gen. Motors Corp.*, 720 So. 2d 654, 659 (La. 1998). This limitation does not bar Schaumburg's claim, since there was a contractual relationship between him and State Farm at the relevant time.

using the duty-risk analysis." *Daye v. Gen. Motors Corp.*, 720 So. 2d 654, 659 (La. 1998).  "The principal juridical element of an action in negligence is a duty, apparent to reason and common sense, to avoid acts and omissions which engender an unreasonable risk of harm to others."  *Smith v. Roussel*, 809 So. 2d 159, 165 (La. App. 1st Cir. 2001) (quoting *Stephens v. State, Through Dep't of Transp.*, 440 So. 2d 920, 925 (La. App. 2d Cir. 1983)).  "Whether a duty is owed is a question of law."  *Id.*  As part of the duty-risk analysis, the plaintiff must show that "the risk of harm was within the scope of protection afforded by the duty breached."  *Id.* at 164-65.  "In determining the limitation to be placed on liability for a defendant's substandard conduct, the proper inquiry is how easily the risk of injury to plaintiff can be associated with the duty sought to be enforced.  Although ease of association encompasses the idea of foreseeability, it is not based on foreseeability alone.  Absent an ease of association between the duty breached and the damages sustained, there is no legal fault."  *Id.* (citing *Roberts v. Benoit*, 605 So. 2d 1032, 1045 (La. 1991)).  The Louisiana Supreme Court has held that a duty to provide correct information was "imposed by law based upon policy considerations due to the tortfeasor's knowledge of the prospective use of the information which expands the bounds of his duty of reasonable care to encompass the intended user."  *Barrie v. V.P. Exterminators, Inc.*, 625 So. 2d 1007, 1016 (La. 1993).  "The theme in [Louisiana cases on negligent misrepresentation] is that one is liable for negligent disclosure if he has superior knowledge and knows the other party is relying upon him for such knowledge."  Frank L. Maraist & Thomas C. Galligan, Jr., *Louisiana Tort Law* § 5.07[8] (2d ed. 2004) (citing *Barrie*; *Devore v. Hobart Mfg. Co.*, 367 So. 2d 836 (La. 1979); *Cagle v. Lloyd*, 617 So. 2d 592 (La. App. 3d Cir. 1993)).

In this case, viewing the evidence in the light most favorable to the nonmoving party on summary judgment, it appears that State Farm had good

reason to expect Schaumburg to use and rely on the information that was given to him at the Baton Rouge meeting. The purpose of that meeting appears to have been to inform agents about what their options were in the aftermath of Katrina. Agents were told about what they must do in order to relocate their businesses, and also about the option of retiring under the special post-Katrina ENP which State Farm made available to them until the end of 2005. It would be reasonable to expect those agents, including Schaumburg, to rely on the information they were given at that meeting as they made important decisions about their futures. According to Schaumburg, he was given incorrect information by McFadden and, in reliance on that information, made the decision to retire, thereby losing several years' worth of income that he could have earned by continuing to work. If McFadden had correctly informed him that he could have relocated his business without signing a new (and unfavorable) contract, he would instead have continued to work and earn income. The harm that Schaumburg claims to have suffered due to the allegedly incorrect information was both foreseeable and easily associated with State Farm's duty to provide correct information, because the information was presented in a context that led agents to rely on it in making decisions with important financial consequences. Therefore, under the duty-risk analysis, State Farm had a duty to provide correct information, and the risk of the harm that Schaumburg allegedly suffered was within the scope of protection afforded by the duty.

The only remaining element of negligent misrepresentation is that the breach of the duty to provide correct information caused damages to the plaintiff. Again, taking the evidence in the light most favorable to Schaumburg, his reliance on the allegedly incorrect information given to him by State Farm caused him to suffer financial harm because it induced him to

13

make the decision to retire early instead of continuing to work and earn income. Under this version of the facts, Schaumburg plainly did suffer damages caused by State Farm's breach of the duty to provide correct information. *Cf., e.g., Barrie*, 625 So. 2d at 1008-09 (holding that plaintiffs who suffered financial losses because they unknowingly bought a termite-damaged building while relying on an incorrect termite inspection report could state a claim against the inspector for negligent misrepresentation).

In summary, State Farm could reasonably have expected Schaumburg to rely on the information he was given at the Baton Rouge meeting in making important decisions such as whether to retire; therefore, State Farm had a duty to provide correct information, and the risk of harm to Schaumburg was within the scope of protection afforded by that duty. The record, viewed in the light most favorable to Schaumburg, shows that State Farm breached its duty when McFadden incorrectly informed Schaumburg at the Baton Rouge meeting that a then-existing company policy required him to sign a new contract before he could relocate his office. This breach of duty caused damages to Schaumburg because he relied on the incorrect information when he made the decision to retire and forgo several years' worth of income. Therefore, Schaumburg has put forth summary judgment evidence establishing that there is at least a disputed question of material fact as to each of the elements of the tort of negligent misrepresentation. We must reverse the district court's grant of summary judgment in State Farm's favor on this claim.

## E. Fraud

Schaumburg has also brought a claim of fraud which is likewise predicated on the allegedly wrong information given by McFadden at the Baton Rouge meeting. "Louisiana jurisprudence indicates that the following are the elements of the tort of fraud: 1. a misrepresentation of material fact;

2. made with the intent to deceive; 3. reasonable or justifiable reliance by the plaintiff; and 4. resulting injury.  The intent to deceive is a specific intent." *Wooley v. Lucksinger*, 14 So. 3d 311, 378-79 (La. App. 1st Cir. 2008); *see also* La. Civ. Code art. 1953; *Guidry v. U.S. Tobacco Co.*, 188 F.3d 619, 627 (5th Cir. 1999).  The elements of fraud are similar to those of negligent misrepresentation, but with the addition of the specific intent to deceive. *Wooley*, 14 So. 3d at 379.  "Fraud . . . may be established by circumstantial evidence."  La. Civ. Code art. 1957; *accord Lafayette Ins. Co. v. Pennington*, 966 So. 2d 136, 138 (La. App. 2d Cir. 2007).

State Farm argues that the company gained nothing from Schaumburg's retirement, so it had no motive to intentionally deceive him into retiring.  We need not decide whether the evidence in the record permits a rational inference that State Farm (through McFadden) intended to deceive Schaumburg, because Schaumburg has waived this issue by failing to brief it on appeal.  *See* Fed. R. App. P. 28(a)(9)(A) (appellate briefs must contain "contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies"); *United States v. Thames*, 214 F.3d 608, 612 n.3 (5th Cir. 2000) (when a party fails to adequately brief an issue, the issue is waived).  His brief contains a few general references to the fraud claim, but no specific argument regarding intent to deceive.  We therefore affirm the district court's dismissal of the fraud claim.

### III.  CONCLUSION

Schaumburg has demonstrated that the evidence in the record shows at least genuine disputes of material fact regarding all the elements of his claim of negligent misrepresentation.  Accordingly, we REVERSE the district court's dismissal of that claim, AFFIRM the district court's dismissal of Schaumburg's other claims, and REMAND the case for further proceedings.

WIENER, Circuit Judge, concurring in part and dissenting in part.

I concur in the panel majority's opinion to the extent that it affirms the district court's dismissal of each of Schaumburg's claims other than the one for negligent misrepresentation. As to that claim, I respectfully disagree with the majority's conclusion that, as non-movant, Schaumburg presented evidence that establishes the existence of a genuine issue of material fact sufficient to defeat State Farm's motion for summary judgment on that claim. More specifically, I do not question the well-reasoned and well-supported opinion of the panel majority that such a genuine dispute exists regarding misrepresentation; rather, I disagree that Schaumburg has presented evidence sufficient to defeat summary judgment on the facet of the claim that any such misrepresentation resulted from negligence.

Even assuming arguendo that State Farm's Vice-President of Agency for Louisiana, Timothy McFadden, misspoke concerning the requirement that agents like Schaumburg were required to sign a new contract before they could relocate their offices following Hurricane Katrina, the panel majority's crediting of Schaumburg's evidence as establishing a genuine issue regarding McFadden's negligence in making that putative misstatement might possibly hold true when viewed in a vacuum. Not so to my thinking, however, when the question of negligence is addressed in the real-world framework of (1) Schaumburg's personal qualities and (2) the horrendous post-Katrina turmoil in which both he and State Farm's personnel were forced to deal with myriad problems under extreme conditions of dislocation, disruption, and theretofore never-experienced confusion and difficulties of communication. I address each element of that framework in order.

Although Schaumburg was undeniably a victim of Katrina's disruption and confusion, he was certainly better equipped by age, intelligence, business experience, and financial acumen than the great majority of the victims of the

storm.  The record reflects that he had been a highly successful State Farm agent for almost a quarter century, was netting in the neighborhood of $1,000,000 as an independent State Farm agent, and was otherwise a seasoned and experienced insurance entrepreneur.  He was very familiar with his own contract with State Farm, the retirement provisions of that contract, and his various options regarding the change of his office locations and regaining or relinquishing his book of business, all depending on where he went post-Katrina and under what circumstances.  Schaumburg was also aware and, apparently, very impressed with the special, highly favorable one-time retirement option that State Farm was offering to him and others similar situated agents to cope with their Katrina woes—an option that included, inter alia, the flexibility of declaring retirement by the end of 2005 and acquiring benefits based on pre-Katrina commissions, coupled with the right to make retirement effective at a much later date of the agent's own choosing.

Louisiana courts evaluate negligent misrepresentation claims on a case-by-case basis, using a duty-risk analysis: "Plaintiff must prove that the conduct in question was a cause-in-fact of the resulting harm, the defendant owed a duty of care to the plaintiff, the requisite duty was breached by the defendant and the risk of harm was within the scope of protection afforded by the duty breached."[1]  Causation is a factual determination,[2] but determining whether the alleged harm was within the scope of the duty—the third element of the duty-risk analysis—is not:

> In the duty/risk analysis, the foreseeability element of proximate
> cause is subsumed into the scope of the duty element and

---

[1] *Daye v. Gen. Motors Corp.*, 720 So. 2d 654, 659 (La. 1998).

[2] *See Smith v. State*, 523 So. 2d 815, 822 (La. 1988) ("Causation is a question of fact.") (citations omitted).

No. 09-30714

becomes part of a question of law of whether the particular risk falls within the scope (ambit of protection) of the duty. Foreseeability is not a question of fact in Louisiana.[3]

To determine foreseeability, Louisiana has "adopted the ease of association test, which asks how easily the risk of harm can be associated with the rule which was breached."[4] "Legal cause requires a proximate relation between the actions of a defendant and the harm which occurs and such relation must be substantial in character."[5] Specifically, the Louisiana Supreme Court has acknowledged that when the defendant expects that the plaintiff will use the information that was negligently provided, the plaintiff's resulting loss is "a foreseeable probability," especially when use of the information "was 'not merely one possibility among many, but the end and aim of the transaction.'"[6]

Assuming arguendo that State Farm owed Schaumburg a duty to provide truthful, accurate information about State Farm's relocation policy and that State Farm breached that duty, Schaumburg still cannot establish that State Farm could have reasonably anticipated that its misrepresentation would cause Schaumburg to incur damages.[7] First, McFadden's alleged

---

[3] *Wooley v. Lucksinger*, 14 So. 3d 311, 429 (La. Ct. App. 2008) (citing *Roberts v. Benoit*, 605 So. 2d 1032 (La. 1991); *Smith v. Roussel*, 809 So. 2d 159 (La. Ct. App. 2001)).

[4] *Roberts*, 605 So. 2d at 1055. *See also Faucheaux v. Terrebonne Consol. Gov't*, 615 So. 2d 289, 294 (La. 1993) ("The scope of protection inquiry asks whether the enunciated rule extends to or is intended to protect this plaintiff from this type of harm arising in this manner. . . . [T]he proper inquiry is often how easily the risk of injury to plaintiff can be associated with the duty sought to be enforced.").

[5] *Sinitiere v. Lavergne*, 391 So. 2d 821, 825-26 (La. 1980).

[6] *Barrie v. V.P. Exterminators, Inc.*, 625 So. 2d 1007, 1016-17 (La. 1993) (quoting *Ultramares Corp. v. Touche*, 174 N.E. 441, 445 (N.Y. 1931)).

[7] *See Daye*, 720 So. 2d at 660-61 ("A negative answer to any of the inquiries of the duty-risk analysis results in a determination of no liability. Because we find that plaintiff has failed the first prong of the duty-risk analysis, we need not examine the remaining elements

statement was made at a regional meeting of all State Farm agents affected by Hurricane Katrina, and *not* in the context of Schaumburg's own relocation or of his own consideration of retiring. Even though Schaumburg's decision to retire might have been *one possibility among many* resulting from McFadden's statement, it was not the aim of the statement allegedly announced to all area State Farm agents at the September meeting. Ultimately, Schaumburg took McFadden's alleged announcement out of the context in which it was made and, to his own detriment,  relied on it unilaterally and without seeking further clarification or verification.

State Farm could not have foreseen the harm experienced by Schaumburg because State Farm had no way of knowing the other factors, unique to Schaumburg, that contributed to his decision to retire. Although "[i]t is well settled in Louisiana law that an intervening act does not *automatically* absolve a prior negligent party from liability," an intervening act will absolve a negligent party if it itself was not "an easily foreseeable result of the [negligent party's] conduct."[8] Here, State Farm could not have foreseen Schaumburg's failure to investigate the truth of the alleged misrepresentation as it applied to his individual situation. Before Hurricane Katrina, Schaumburg earned more than $1 million annually as a State Farm agent. He had worked for State Farm for more than two decades, making him a knowledgeable and sophisticated agent of the company—not to mention making him personally familiar with State Farm executives and other State

---

and find no liability on the part of the defendant under the theory of negligent misrepresentation.") (internal citation omitted).

[8] *Roberts*, 605 So. 2d at 1055-56 (emphasis added) (citing *Hernandez v. Toney*, 289 So. 2d 318, 321 (La. Ct. App. 1973)) (explaining that when an apartment complex manager required an unattended five-year-old to leave a fenced playground, the risk of the child getting hit by a car was easily associated with the manager's negligence, despite the negligence of the driver).

Farm agents. Yet, Schaumburg conceded in testimony that he did not make *any* attempt to gather further information or to verify the comments made about State Farm's relocation policy, despite acknowledging that electing to retire was a "very significant" life decision.

Neither could State Farm have foreseen that Schaumburg would reject or discount the value of the available option of continuing to work in Metairie under his existing Agreement. Schaumburg framed the situation as, "I just knew what I wanted to do, and if I couldn't do that, [ ] I would retire. And I did not want to be an agent in Metairie, Louisiana." Yet he never communicated this subjective desire to anyone at State Farm; and he did have the option of staying in Metairie, which would not have involved retiring *or* signing a new contract. Therefore, even though State Farm arguably could have foreseen that misstatements about the relocation policy might have dissuaded some agents from *relocating*, it could not have foreseen that misstatements of that nature could cause Schaumburg to take the drastic step of *retiring* if doing so was not otherwise in his best interest.

Schaumburg also attempts to minimize the other factors that necessarily affected his decision. At the age of sixty-two, Schaumburg was nearing his expected retirement age, and the post-Katrina ENP offered advantageous benefits that might not have been comparable to those he would receive if he waited. Schaumburg also tries to discount the facts that relocating his office to a new area would involve his incurring particular costs *and* that reestablishing a profitable business in the post-Katrina marketplace was a risky endeavor. Schaumburg even testified that, ideally, he would have liked to go back to his original office in Chalmette, "[b]ut realizing that four months after this hurricane, September, October, November, December, it was still chaos, who knew anything about anything?" Thus, we must consider the fact that Schaumburg's decision to retire just three years before his

earliest expected retirement under the advantageous post-Katrina ENP offered gratuitously by State Farm, presented the *least risky* option for him personally, no matter what State Farm allegedly misstated about signing new contracts.  Another example of "no good deed goes unpunished."

At bottom, Schaumburg's claim is based entirely on the benefit of 20/20 hindsight. State Farm, like most other businesses in the region, was in a state of flux and disarray following Hurricane Katrina.  It held the Baton Rouge meeting only one month after the storm in an effort to regroup and introduce State Farm's amended ENP. Tellingly, Schaumburg testified, "I was happy with my decision to retire, but I felt like that after I had announced my retirement and done what I did that the rules of engagement changed." Although Schaumburg now questions his decision to retire under the post-Katrina ENP, he cannot blame State Farm's alleged misrepresentation for his decision: State Farm could not have foreseen that Schaumburg would make such a "life-changing" decision without any further investigation of his options.  And, regardless, Schaumburg's decision was based on many competing interests, not least of which was the risk involved in relocating his office in the chaotic aftermath of Hurricane Katrina.

Therefore, even if we assume that State Farm had a duty to provide accurate relocation information to Schaumburg and, arguendo, that State Farm breached that duty, Schaumburg still fails to establish that State Farm could have reasonably foreseen the specific harm that Schaumburg allegedly incurred based solely on McFadden's general announcement at the Baton Rouge meeting to all regional State Farm agents. I would hold that the undisputed evidence does not support the inference that State Farm's alleged misrepresentation was the legal cause of Schaumburg's damages and, therefore, that the district court's grant of State Farm's motion for summary

No. 09-30714

judgment dismissing Schaumburg's negligent misrepresentation should be affirmed.

Schaumburg's fraud claim must be dismissed for the same reasons,[9] coupled with the fact that Schaumburg presents no evidence that McFadden's announcement was made "with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other."[10] To the contrary, as noted above, Schaumburg repeatedly testified that he did not believe that State Farm wanted him to retire, only that they made a misrepresentation.  I, therefore, respectfully dissent from the majority's reversal of the district court judgment.

---

[9] *See Wooley*, 14 So. 3d at 379 ("Negligent misrepresentation is essentially a less culpable version of fraud because fraud requires specific intent [to deceive].").

[10] LA. CIV. CODE art 1953.

22