927 So.2d 645 (2006)
BANK ONE, NA, Plaintiff-Appellee,
v.
Floyd DUNN, Jr. d/b/a Dunn Electric, Defendant-Appellant.
No. 40,718-CA.
Court of Appeal of Louisiana, Second Circuit.
April 12, 2006.
*646 Davis Law Office, LLC, by S.P. Davis, for Appellant.
Pettiette, Armand, Dunkelman, Woodley, Byrd & Cromwell, L.L.P., by Leland David Cromwell, Felix J. Bruyninckx III, Joseph Samuel Woodley, Shreveport, for Appellee.
Before STEWART, DREW and MOORE, JJ.
DREW, J.
This case involves an international scam and allegations which can only be described as bizarre. Floyd Dunn appeals a judgment granting Bank One's motion for summary judgment against his reconventional demand.[1] We affirm.

FACTS
Floyd Dunn, an electrician by trade, had the good fortune, or misfortune as the case may be, of making the acquaintance of the son of the President of Zaire, Mobutu Sese Seko, while traveling to California in the 1980s.[2] Dunn took up the son's invitation to visit Zaire and met with President Mobutu. Dunn asserted that he was hired as a lobbyist for Zaire in the United States, and registered with the Justice Department as a foreign agent. Among Dunn's actions on behalf of Zaire was an attempt to establish a consulate office for Zaire in Shreveport.
Dunn stated that he lobbied for Zaire for approximately three years. Seeking compensation for his efforts, he sent a bill for $500,000 to Zaire, which was not paid. Dunn explained that after he met with the leader of Nigeria, General Sani Abacha, it was then arranged that he would also begin lobbying in the United States on behalf of Nigeria, although Dunn never registered as a lobbyist for Nigeria. In order to pay Dunn for his lobbying, Zaire agreed to trade computers to Dunn, who would then sell these computers to Nigeria for $32,100,000. Dunn added that he was given a contract number for the transaction.
Dunn estimated that he lobbied for Nigeria until 2000, when there was a change in the government of Nigeria. Afterwards, he visited Nigeria and Zaire in hopes of receiving his money, but he was unsuccessful. Dunn claimed that he was later contacted by a "Senator Frank" from Nigeria, whom Dunn did not know. Senator Frank, who apparently knew Dunn's *647 contract number, told Dunn that he owed back taxes to Nigeria which had to be paid before Dunn would receive his $32,100,000. Senator Frank offered to send Dunn a check for $315,000 in order to pay these taxes. As requested, Dunn provided Senator Frank with the number of his checking account at Bank One. Senator Frank told Dunn that $315,000 would be deposited into the account, but he did not tell Dunn the payor of the check. Dunn stated that he never personally deposited the check and never saw the check before it was deposited.
Floyd Dunn had opened a checking account at Bank One in August of 1997 in the name of Floyd Dunn d/b/a Dunn Electric. On August 1, 2001, a check in the amount of $315,000 was deposited into the account. Prior to that time, the account balance had never exceeded $5,000. The check was payable to Dunn Electric Co. and was drawn on the account of Argenbright Security Incorporated at First Union National Bank of Georgia. Provisional credit was given for this amount. On August 2, 2001, Dunn wrote a check on his Bank One bank account for $250,000 to First Guaranty Bank in Oil City, where Dunn had another account.[3] Pursuant to Senator Frank's instructions, Dunn then wired $250,000 to an account at a Virginia bank held by a Walter Cleves, whom Dunn did not know.
On August 2, 2001, the $315,000 check was sent out in transit to the Federal Reserve, which attempted to process the check to First Tennessee Bank. This check was returned to the Federal Reserve and then to Bank One on August 7. Believing that the check contained an incorrect routing number, Bank One wrote the routing number of First Union National Bank of Georgia on the check and sent the check back to the Federal Reserve on August 9. First Union returned the check as counterfeit to the Federal Reserve on or about August 15. The check was returned to Bank One on August 16, and Bank One charged back the check to the account of another customer on that date.
On August 23, 2001, Dunn completed a wire transfer of $27,000 from his Bank One account to an account held by Cleves in Virginia. Dunn had originally attempted to wire this amount two days earlier, but it had been sent to an incorrect location. On September 21, 2001, Bank One was alerted that it had charged back the counterfeit check against the wrong account. On September 24, the counterfeit check was charged back against Dunn's account.
Dunn claimed that he eventually received a cashier's check payable on a Citi Bank account for $32,100,000. That check was sent by courier. Apparently still hopeful that he would receive his windfall, Dunn took the check to First Guaranty Bank and asked for it to be verified. Dunn stated that he contacted the FBI after discovering the scam.
Bank One filed suit against Dunn on June 6, 2003, alleging that Dunn owed $281,019.11, together with legal interest and attorney fees, for the overdraft of the checking account. Dunn filed an answer and reconventional demand in which he sought, among other damages, an offset of any amount rendered against him in judgment on the original demand. Dunn alleged that Bank One was negligent in giving credit for the counterfeit check when its fraudulent nature could have been determined through due diligence and reasonable prudence.
Bank One filed a motion for summary judgment as to the original and reconventional demands. The trial court granted the motion for summary judgment on the *648 original demand, but held the motion for summary judgment on the reconventional demand in abeyance to allow the parties to make additional filings. Bank One's motion for summary judgment on the reconventional demand was later granted. Dunn appealed the judgment dismissing the reconventional demand.

DISCUSSION
Dunn's first assignment of error is that the trial court erred in granting Bank One's motion for summary judgment against his reconventional demand. Dunn has not appealed the judgment granting Bank One's motion for summary judgment as to the main demand.
The summary judgment procedure is designed to secure the just, speedy, and inexpensive determination of every action, and the procedure is favored and shall be construed to accomplish these ends. La. C.C.P. art. 966(A)(2). Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966(B). Appellate courts review summary judgments de novo under the same criteria that govern the district court's consideration of whether summary judgment is appropriate. NAB Natural Resources, L.L.C. v. Willamette Industries, Inc., 28,555 (La.App.2d Cir.8/21/96), 679 So.2d 477.
Dunn asserts that a genuine issue of material fact remains regarding whether the damages sustained were caused by Bank One's negligence. Dunn's argument is that contrary to Bank One's deposit policy, Bank One immediately gave his account credit for the $315,000 before verifying that the check was legitimate. Dunn contends that had he known that his account was being credited for the $315,000 before Bank One verified the check, then he would not have transferred the money from his account. In essence, his argument is that Bank One should have protected him from himself. Under the circumstances of this case, Bank One owed Dunn no such duty.
The facts of this case would be incredibly comical were it not for the huge amounts of money involved. It is apparent from Dunn's deposition testimony that he was at least cognizant that such fraud schemes existed in the world:
Q: Before this time did you have any familiarity with what we commonly call Nigerian fraud schemes?
A: I had heard about it, yes.
Q: Were you aware of it prior to August 1, 2001?
A: No.
Q: So it's only after the $315,000 check was deposited that you became aware of the Nigeria fraud schemes?
A: I saw something pertaining to this on TV at one time, but I never thought I would be involved in it.
Q: Was that prior to this check being deposited or after?
A: Prior to that.
At the very least, Dunn's suspicions should have been raised when his $500,000 lobbying fee was suddenly increased to $32,100,000 through a scheme involving a computer transaction. Certainly, Dunn would have had to ask himself why Zaire would part with computers worth over $32 million when the country only owed less than 1/50th of that amount to Dunn in the first place.
More importantly, Dunn should have recognized a red flag when he first heard the details of the arrangement concocted by Senator Frank, whom he had never met *649 prior to their one telephone conversation. Dunn's trust of Senator Frank was premised on Senator Frank's knowledge of Dunn's contract number. Dunn should have wondered why Senator Frank, acting either as a private citizen or on behalf of Nigeria, would offer to pay back taxes supposedly owed by Dunn.
Perhaps Dunn was simply naïve for trusting someone he did not know with his bank account information and then by actively participating in the scheme by wiring money on three occasions. Perhaps Dunn lost all common sense once he spied the $32,100,000 pot of gold at the end of the rainbow. Regardless, under these circumstances, Bank One owed no duty to protect Dunn from his notably poor judgment.
Dunn also contends that Bank One is liable for damages because it acted unreasonably by its delay in determining the counterfeit nature of the check. In making this argument, Dunn relies on La. R.S. 10:4-214(a), which provides:
If a collecting bank has made provisional settlement with its customer for an item and fails by reason of dishonor, suspension of payments by a bank, or otherwise to receive settlement for the item which is or becomes final, the bank may revoke the settlement given by it, charge back the amount of any credit given for the item to its customer's account, or obtain refund from its customer, whether or not it is able to return the item, if by its midnight deadline or within a longer reasonable time after it learns the facts it returns the item or sends notification of the facts. If the return or notice is delayed beyond the bank's midnight deadline or a longer reasonable time after it learns the facts, the bank may revoke the settlement, charge back the credit, or obtain refund from its customer, but it is liable for any loss resulting from the delay. These rights to revoke, charge back, and obtain refund terminate if and when a settlement for the item received by the bank is or becomes final.
Emphasis added.
A bank is required to exercise ordinary care in sending notice of dishonor after learning that the item has not been paid or accepted. La. R.S. 10:4-202. Notifying the customer of dishonor after the bank's midnight deadline may constitute the exercise of ordinary care if the bank took proper action within a reasonably longer time, but the bank has the burden of establishing timeliness. Id.
Comment six to La. R.S. 10:4-214 states that the right of charge back does not relieve the bank from any liability for failure to exercise ordinary care in handling the item, and the measure of damages for such failure is stated in La. R.S. 10:4-103(e), which provides:
The measure of damages for failure to exercise ordinary care in handling an item is the amount of the item reduced by an amount that could not have been realized by the exercise of ordinary care. If there is also bad faith it includes any other damages the party suffered as a proximate consequence.
Comment six to La. R.S. 10:4-103 explains, "When it is established that some part or all of the item could not have been collected even by the use of ordinary care the recovery is reduced by the amount that would have been in any event uncollectible."
Dunn's liability is not diminished because of Bank One's delay in notifying Dunn that the check was counterfeit. Even if Dunn had received earlier notice from Bank One that the check was counterfeit, he still had no recourse against Argenbright Security. The $315,000 was *650 uncollectible against Argenbright Security. We emphasize that Dunn showed great alacrity in moving most of the funds from his account, as indicated by Dunn's $250,000 check to First Guaranty that was dated the day after the $315,000 deposit. The motion for summary judgment was properly granted on the reconventional demand.
Dunn next argues that the trial court erred in holding him personally liable for the judgment rendered against Dunn Electric. This argument, which is raised for the first time on this appeal, is without merit. Dunn testified that his company was incorporated. Nevertheless, his account was opened up under the name of Floyd Dunn, Jr. d/b/a as Dunn Electric. We also note that in August of 2001, although his Bank One checks bore the name of Dunn Electric Company, his Bank One account statements still listed "Floyd Dunn, Jr. dba Dunn Electric" as the account owner.

DECREE
At appellant's costs, the judgment is AFFIRMED.
NOTES
[1] JP Morgan Chase Bank, N.A. acquired Bank One after this suit was filed.
[2] Zaire is now known as the Democratic Republic of the Congo. Originally a Belgian colony, the Republic of the Congo gained its independence in 1960. Col. Joseph Mobutu, who declared himself president in a November 1965 coup, changed the name of the country to Zaire, and his own name to Mobutu Sese Seko. Mobutu was toppled in 1997, and the country was given its present name. http://www.cia.gov/ cia/publications/ factbook/geos/cg.html
[3] Bank One gave credit for this check on August 6.