STEWART, J.
| tAfter falling prey to a form of what is referred to as a “Nigerian check scam,” the plaintiff law firm, Simmons, Morris & Carroll, LLC (hereafter “SMC”), sued the defendants, Capital One, N.A. (“the bank”) and Tonya Lambert (“Lambert”), to recover funds in the amount of $349,175 wired by SMC from its client trust account to what it believed to be a collections client in Japan. Following a bench trial, the trial court rendered judgment in favor of SMC finding that its damages arose solely from the negligent misrepresentation by the bank, through its employee Lambert, that the check representing the funds SMC sought to wire had “cleared” and the specific funds from the check were available in the trust account to be wired. The trial court also granted SMC’s request for attorney fees authorized by La. C.C.P. art. 1472, awarding an additional $90,000 upon finding that Lambert did not properly admit facts in the requests for admissions propounded by SMC. The defendants filed a suspensive appeal. Because we find that SMC did not justifiably rely on the representations made by Lambert and that it is not otherwise entitled to recovery, we reverse the trial court’s judgment in toto.
FACTS
On November 30, 2011, SMC received an email, designated as “SPAM,” relaying a message from an individual named Hiro-shi Oeki (hereafter “Oeki”) of Eki Trading Co., Ltd., in Japan. The message stated, “We would like to retain your firm for debt collection purpose in your state, contact us if you can.”[1] Attorney Trey Morris (“Morris”) forwarded the 12message to Gerald Adam Savoie (“Savoie”), a new attorney with the firm, with instructions to “[ejmail these people back.” Savoie replied to Oeki by email and let him know that more details about the debt matter would be needed for SMC to determine whether to provide representation. Savoie requested information about whether the matter involved “multiple debts in this state or just one,” how the debts were incurred, and the amounts. Oeki responded, “Thanks for your urgent responds, we have a collection matter in your state, the debt owe to us is $350,000 since January 2011, forward us engagement letter to sign and furnish us with your service charges.”
On December 1, 2011, Savoie replied to Oeki’s email and again requested information about the debt, including the debtor’s name and location. Savoie explained that upon receipt of this information, SMC would have to check for any conflicts. He also informed Oeki of SMC’s rates and asked whether he would prefer the $275 hourly rate with the $10,000 retainer or the 25 % contingency fee plan with a $2,000 retainer.
On December 5, 2011, Savoie received the following email from Oeki:
Thanks for your mail, we have inform our debtor of our intention to take legal action, they are nor scared and said they do not want litigation the company do not want a negative mark on their credit report and the have agreed to settle their debt.
I am please to notify you that our debtor head office as issued a final and total *1210 payment of their debt of $350,000 no legal action should be taking at the moment, we should wait till two weeks for the payment, if the payment is not received we can go ahead and take a legal action.
Please once payment is receive deduct your retainer fee and all applicable charges from the payment and let us know when to send you our account receivable for you to return the proceed.
|sIt next appears that on December 8, 2011, Savoie, via email, again checked with Morris about his thoughts on the email from Oeki and asked whether any check had been received. Morris then asked Savoie if SMC had gotten a retainer. Sa-voie emailed Oeki to advise him that SMC had not yet received a retainer check and asked when to expect one. That same day, Oeki emailed Savoie again informing him that the payment would be received within two weeks and that if not received, then they would go ahead with legal action.
SMC never received a retainer from Oeki and never obtained any information about the debtor or debt he was purportedly seeking SMC’s assistance in collecting. However, on or about January 19,
2012, SMC received what appeared to be a cashier’s check (“the check”) from the Bank of Nova Scotia in the amount of $350,000 payable to SMC. The memo line on the check read “Radio Shack.” Along with the cheek was a letter from a “Peter Andrews,” which stated:
Please contact your client Eki Trading Co., Ltd. once you have receive [sic] this payment. This is a certified check of $350,000.00 we have send [sic] this part payment of the money owed to avoid litigation brought against us and we shall pay the balance $300,000 by the end of January, 2012.
The letter did not mention “Radio Shak” as the debtor or provide any reason for the debt. The letter referred to an additional $300,000 balance when Oeki had identified the debt as one for $350,000. The letter did not have a business address for Andrews, and the envelope did not have a return address. The email address “pandrews@financier.eom” was the only contact information provided in the letter.
l4Savoie notified Oeki via email of receipt of the check. Savoie’s email stated that SMC had not received a retainer and that the December invoice in the amount of $825 had not been paid. He asked whether SMC should deduct its charges from the check “written by Radioshack.” Oeki replied to Savoie, instructing him to deduct SMC’s charges and “wire the balance.”
Savoie gave the check to Darbi Rice, SMC’s office manager, to deposit in the trust account.[2] Rice prepared the deposit slip. She testified that she did not recognize that the check was a foreign check. SMC’s runner took the deposit, which included the check and an additional deposit in the amount of $5,000, to the bank. No one at SMC noted or informed the bank that the check from the Bank of Nova Scotia was a foreign check. Likewise, the teller who took the deposit failed to note that the check was a foreign check and mistakenly processed it as a deposit of a domestic check. As a result of this oversight, SMC’s account was provisionally credited for the $350,000 deposit. However, that same night the bank’s proof department in Texas caught the mistake and reversed the provisional credit. A notification letter informing SMC of the error in *1211 its deposit and the correction was generated on January 20, 2012. The letter explained that the check was drawn on a foreign bank and not payable through the domestic collection process. Instead, the check would be collected through the bank’s International Department and SMC’s account would be credited upon receipt of the funds from the payor bank. SMC did not receive this | ^letter until January 26, 2012. However, according to Laura Wilson (“Wilson”), the bank’s branch manager, SMC could have learned of the reversal of the $350,000 deposit by accessing its account through online banking. In fact, SMC’s online banking record printed on January 26, 2012, supports Wilson’s testimony on this point.
On January 28, 2012, Oeki again emailed Savoie to confirm whether he had received the information about where to wire the funds. Savoie advised Oeki that he had received the information but that SMC would only disburse funds from its trust account by check. Oeki responded that the funds had to be wired because it would take 90 days for a check to clear in Japan. If SMC could not wire the funds, then Oeki asked that it return the check “to our debtor Radio Shack.” SMC opted to wire the funds, rather than return the check to the alleged debtor.
On January 24, 2012, Savoie asked Rice to wire the funds to Oeki. According to Rice and Morris, SMC’s policy concerning checks over $50,000 is to call the bank to verify that the check has cleared before disbursing the funds to clients. Therefore, Rice called the bank that day but was unable to reach the person she typically dealt with and left a message. Neither Rice nor anyone at SMC accessed the account online to see whether the funds from the check were in the trust account.
On January 25, 2012, Lambert returned Rice’s call. Rice testified that she verified with Lambert that the funds from the check had “cleared” and were in the account balance. But in speaking with Lambert, Rice did not tell her that she was inquiring about a foreign check. Before the wire could |fibe sent, the bank required the verbal authorization of a party on the account. Because Morris was out of the office, Rice asked attorney Cynthia Carroll-Bridges (“Carroll-Bridges”) to authorize the wire. Carroll-Bridges knew that the funds were associated with Savoie’s collection case and that they were to be wired to Japan. She was hesitant about authorizing the wire because it was a large sum of money, she had heard of scams targeting attorneys, and she had even received similar junk emails.[3] However, she had never discussed these scams with Morris or Savoie. Carroll-Bridges sent a text to Morris asking whether he wanted her “to verify this big transfer of money.” Morris directed her to go ahead with the wire if the $350,000 deposit was in the account. Though Rice had assured her that she had verified with Lambert that the funds from the check were in the account, Carroll-Bridges testified that she spoke with Lambert on the telephone and again asked Lambert twice whether the funds from the check had cleared and whether the money was in the account. The record does not indicate that Carroll-Bridges told Lambert that she was inquiring about a foreign check or that Carroll-Bridges even knew it was a foreign check. She testified that Lambert assured her that the check had cleared and that the funds from the check were available in the account. Again, SMC never accessed its account to ascertain whether the funds from the check were in its account and *1212 never informed Lambert that the check was a foreign check. Relying on Lambert’s representations, Carroll-Bridges authorized the wire transfer.
|7We note that the record includes a letter from SMC bearing Morris’s signature that was faxed to Laura Wilson at 10:37 a.m., on January 25, 2012, requesting the wire transfer and providing the information necessary for is completion. Nothing in the letter or the attached information concerning the transfer indicates that SMC was conditioning the transfer on the check having cleared and the funds from the check being available in the trust account. Deducting $825 in charges for its services in the collection matter, SMC transferred $349,175 dollars from its trust account to the Japan Trading Company as directed by Oeki.
The next day, January 26, 2012, SMC received the bank’s notification letter and learned that the $350,000 check was not deposited into its trust account. Rice testified that Morris had her check the online account information and get a printout. The account details and history showed the deposit on January 20, 2012, and the bank’s correction reversing the $350,000 deposit that same date. Rice also spoke with Wilson at the bank about the wire transfer and Lambert telling her and Carroll-Bridges that the check had “cleared.” Wilson testified that this was when she first learned that the check was a foreign check.
On January 27, 2012, Wilson informed Morris that she spoke with a contact at the Bank of Nova Scotia and verified that the check was a counterfeit. Morris, Rice, and Carroll-Bridges went to the bank to speak with Lambert. They testified that she admitted telling Rice and Carroll-Bridges that the check had cleared and that the specific funds from the check were in the account when they spoke prior to authorizing the wire [¡^transfer. After Lambert’s alleged admission, Morris began recording the rest of their conversation with his cell phone. As shown by the four-page transcript of the recorded part of the conversation, Lambert admitted that she did not go through individual transactions on SMC’s account when she was asked by Rice and Carroll-Bridges about the check.
After an unsuccessful attempt to reverse the wire transfer, SMC filed suit on February 7, 2012, alleging negligent representation by the bank through Lambert. SMC alleged that it complied with its contract with the bank by contacting a relationship banker with questions about the availability of funds from a deposit, that Lambert affirmed the availability of the specific funds from the check, and that it relied on Lambert’s unconditional assertions that the check had “cleared” and the funds from the check were available to be wired.
In their answer, the defendants denied that Lambert was asked or stated prior to the wire transfer that the specific funds from the check were in SMC’s trust account. They also denied any statements attributed to Lambert from the “clandestine recording” made on January 27, 2012, until able to review the recording. Defendants asserted a number of affirmative defenses, including the fault of the plaintiff and / or a third party. They also asserted the protections of transfer warranties and indorser obligations under Louisiana’s Commercial Laws, La. R.S. 10:1-101, et seq., and the indemnification provision under the wire transfer agreement. ■
A bench trial was held on June 12, 2012. At trial, Lambert denied that Rice and Carroll-Bridges had asked her whether the check had cleared |fland denied telling them that the specific funds from the check were in the trust account. She testified that they asked whether there were *1213 any “stops” or “holds” on the check, and she explained that this information would have been reflected on the “general tab,” which is all she looked at when she spoke with them prior to completing the wire transfer. Lambert testified that because the general tab did not show any stops or holds on deposited checks and because she did not know that the check they were asking about was a foreign check, she did not believe there was any reason to look at the tab showing the individual transactions on SMC’s trust account to verify the funds available for the wire transfer. The trust account’s balance at the time of this inquiry was approximately $900,000.
In her testimony, Wilson agreed that a customer should contact a banking officer with questions about deposited funds. She explained that foreign checks are. sent for collection. While in the collection process, the foreign check is not yet deposited and would not appear in the account as a stop or hold on the funds. The testimony of both Wilson and Lambert indicated that because Lambert did not know the inquiry was about a foreign check and because no stops or holds appeared on the general tab showing the account’s available balance, Lambert did not believe it necessary to check the individual transactions associated with the account to verify the information sought by Rice and Lambert.
At the close of the trial, the trial judge ruled from the bench in favor of SMC. The trial judge found this to be “a straightforward negligent misrepresentation and detrimental reliance case.” He found that Lambert |inwas asked specifically about the check and told Rice and Carroll-Bridges that the check had cleared. The trial judge found that SMC, by contacting the bank about the availability of the funds from the check, did what the rules thrust upon it by the bank required. Analogizing this matter to In re Succession of McKnight, 33,802 (La.App.2d Cir.10/4/00), 768 So.2d 794, writ denied, 2000-3072 (La.2/9/01), 785 So.2d 822, discussed infra, the trial judge found that the bank assumed the duty to instruct SMC concerning the “assets for distribution of account funds,” that it owed a duty of reasonable care in so advising SMC, and that it breached this duty. The trial judge found no fault on the part of SMC. He concluded that SMC’s damages arose solely from the negligent misrepresentation by Lambert and not from the actions of the scam artists behind the counterfeit check.
On July 1, 2013, the trial judge, heard and granted SMC’s motion for attorney fees and expenses under La. C.C.P. art. 1472. ' The trial judge found that the requests for admissions propounded by SMC were not properly admitted or supplemented when appropriate and that they were not answered in good faith. SMC asked for the full 40 percent contingency fee owed its trial counsel, which would have been $139,670. However, the trial court awarded $90,000 in attorney fees plus expenses.
The final judgment decreeing the defendants liable in solido for damages in the amount of $349,175, attorney fees of $90,000, $3,117.53 in expenses, plus courts costs and interest was signed by the trial judge on July 15, 2013. The defendants appealed.
|„ DISCUSSION
The defendants’ primary issue for review is whether they may be held liable for negligent misrepresentation or detrimental reliance based on Lambert’s statement regarding the status of the check when the bank had no contractual duty to advise SMC because the foreign check was accepted for collection only, SMC’s agents did not tell Lambert that they were inquiring about a foreign check, and SMC re *1214 ceived the check under circumstances suggesting a scam.

Applicable Law:

A trial court’s factual findings will not be disturbed unless the record establishes that no reasonable, factual basis exists for the findings and that they are clearly wrong or manifestly erroneous. Daye v. General Motors Corp., 97-1653 (La.9/9/98), 720 So.2d 654; Rosell v. ESCO, 549 So.2d 840 (La.1989). The issue to be resolved is not whether the trial court was right or wrong, but whether its conclusion was a reasonable one. Foley v. Entergy Louisiana, Inc., 2006-0983 (La.11/29/06), 946 So.2d 144; Stobart v. State, Through Dept. Of Transp. and Development, 617 So.2d 880 (La.1993). Where there are two reasonable views of the evidence, the fact-finder’s choice cannot be manifestly erroneous or clearly wrong. Stobart, supra.
Findings of fact based on credibility determinations made by the trial court are to be given great deference. Feirell v. Fireman’s Fund Ins. Co., 94-1252 (La.2/20/95), 650 So.2d 742. Absent a finding that the witness’s story is contradicted by documents or objective evidence or that the story is | ^internally inconsistent or implausible, a factual determination based on the factfinder’s decision to credit the testimony of two or more witnesses can “virtually never be manifestly erroneous or clearly wrong.” Id., citing Rosell, supra.
While the above standards emphasize the deference to be accorded to the factfin-der, the supreme court has cautioned the following:
Daye, 97-1653, p. 6, 720 So.2d at 659 (citations omitted); Ambrose v. New Orleans Police Dept. Ambulance Service, 93-3099 (La.7/5/94), 639 So.2d 216.
Although deference should be accorded to the factfinder, the court of appeal and this court have a constitutional duty to review facts. Therefore it is improper to assert that a trial court’s factual determinations “cannot ever, or hardly ever, be upset.”
With these standards in mind, we find no error in the trial court’s findings of fact as to what was said during the telephone conversations Lambert had with Rice and Carroll-Bridges prior to the wire transfer. The trial court made credibility determinations in favor of SMC and found that Lambert was specifically asked about the check and that she told Rice and Carroll-Bridges that the check had cleared. We cannot say that the trial court’s choice between two reasonable views of the evidence was clearly wrong or manifestly erroneous. However, these factual findings alone are not determinative of whether SMC is entitled to recover for negligent misrepresentation or detrimental reliance.
Our jurisprudence has recognized that the broad language of La. C.C. arts. 2315 and 2316 encompasses the tort of negligent misrepresentation or misinformation. Daye, supra; Devore v. Hobart Mfg. Co., 367 So.2d 836, |ia839 (La.1979). However, jurisprudence has also limited its application to cases where a contractual or fiduciary relationship exists. Daye, supra, and cases cited therein. Negligent misrepresentation cases are evaluated on a case-by-case basis using the duty-risk analysis. Daye, supra; Barrie v. V.P. Exterminators, Inc., 625 So.2d 1007, 1015 (La.1993); Long v. Bruns, 31,427 (La. App.2d Cir.1/20/99), 727 So.2d 664, writ denied, 99-0480 (La.4/23/99), 742 So.2d 881. As explained by the supreme court, the duty-risk analysis “adequately protects the misinformer and the misinformed because the initial inquiry is whether, as a matter of law, a duty is owed to this particular plaintiff to protect him from this particular harm.” Barrie, 625 So.2d at *1215 1016. To prevail on a negligent misrepresentation claim, there must be a legal duty on the part of the defendant to supply correct information, there must be a breach of that duty, and the breach must have caused damages to the plaintiff. Barrie, supra; Succession of McKnight, supra. The plaintiffs damages must result from his justifiable reliance on the defendant’s misrepresentation. Tres’ Chic In A Week, L.L.C. v. Home Realty Store, 2007-1373 (La.App.lst Cir.7/17/08), 993 So.2d 228; Hughes v. Goodreau, 2001-2107 (La.App. 1st Cir.12/31/02), 836 So.2d 649, unit denied, 2003-0232 (La.4/21/03), 841 So.2d 793.
Detrimental reliance is a doctrine designed to prevent injustice by barring a party from taking a position contrary to his prior acts, admissions, representations, or silence. Luther v. IOM Co., LLC, 2013-0353, p. 10 (La.10/15/13), 130 So.3d 817, 825. Detrimental reliance is codified under La. C.C. art. 1967, which states:
114Cause is the reason why a party obligates himself.
A party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was reasonable in so relying. Recovery may be limited to the expenses incurred or the damages suffered as a result of the promisee’s reliance on the promise. Reliance on a gratuitous promise made without required formalities is not reasonable.
A detrimental reliance claim requires proof of a representation by word or conduct, justifiable reliance on the representation, and a change in position to one’s detriment because of the reliance. Id.; Suire v. Lafayette City-Parish Consol. Government, 2004-1459 (La.4/12/05), 907 So.2d 37; All-britton v. Lincoln Health System, Inc., 45,537 (La.App.2d Cir.10/20/10), 51 So.3d 91.
Thus, both negligent misrepresentation and detrimental reliance claims require justifiable reliance by the claimant on the (mis)representation by the defendant in order to recover.

Review of Claims:

The defendants argue that they owed no duty to advise SMC because there was no fiduciary relationship between SMC and the bank. In support of their argument, they cite La. R.S. 6:1124, which states that no financial institution, its officers, or employees “shall be deemed or implied to be acting as a fiduciary, or have a fiduciary obligation or responsibility to its customers” in the absence of a written agency or trust agreement by which the financial institution agrees to act as a fiduciary.
As argued by the defendants, there is no written agreement establishing a fiduciary relationship in this matter. However, the absence of 11fia written fiduciary agreement does not foreclose the finding of a duty. The legislature, in enacting La. R.S. 6:1124, “did not intend to totally immunize banks from all legal duties in their relationship with customers and third parties.” BizCapital Business & Industrial Dev. Carp. v. Union Planters Corp., 2003-2208 (La.App.4th Cir.9/8/04), 884 So.2d 623, writs denied, 2004-2473 (La.1/14/05), 889 So.2d 267 and 2004-2505 (La.1/14/05), 889 So.2d 268. While the ordinary relationship between a bank and its customer is that of a debtor-creditor relationship with the bank having no independent duty of care, this court recognized that “certain special circumstances will give rise to a duty.” In re Succession of McKnight, 33,802, p. 3, 768 So.2d at 797.
In McKnight, this court affirmed the trial court’s judgment finding the defen *1216 dant bank liable under a theory of negligent misrepresentation. The defendant bank failed to provide the correct information when advising its customer on opening a joint account with the plaintiff that would allow for the disbursal of the account funds to the plaintiff upon the customer’s death. This court found that once the defendant bank assumed the responsibility to instruct the customer on the disbursal of the account funds after her death and agreed to distribute them to the plaintiff, it “owed a duty of reasonable care” in advising how to achieve the intended result in favor of the plaintiff. Id., 33,802, p. 6, 768 So.2d at 798.
Analogizing this matter to McKnight, supra, SMC argues that once the bank, through Lambert, assumed the responsibility to advise it as to whether the check had cleared, it owed a duty of reasonable care in advising |1fion the status of the check. However, McKnight, supra, is distinguishable and does not support a finding of a duty in this matter. The bank in McKnight was advising a customer on a matter within its particular area of expertise, namely, how to set up a joint-tenant account so that upon the death of one tenant, the balance would pass to the surviving tenant rather than the decedent’s estate. Here, the information sought from Lambert was equally available to SMC by accessing its trust account online, which would have shown that the funds from the check were not in the account and that, obviously, the check had not “cleared.”
SMC also argues that the “Rules Governing Deposit Accounts” establish a legal duty on the part of the bank to exercise ordinary care,[4] obligate the customer to ask a banking officer questions regarding the availability of funds, and obligate the bank to provide correct information regarding the availability of funds.
The following excerpted provisions from the rules are applicable to this matter:
Accepting Items for Deposit
• Capital One Bank will accept items for deposit, but acts only as your agent for collection and assumes no responsibility for these items, beyond the exercise of ordinary care.
• Even though we credit your account for the amount of any item, this credit is temporary until we receive final payment in cash or other manner acceptable to us.
• Any temporary credit may be reversed by us.
117* All foreign checks are handled as collection items only, and a fee will be assessed.
Receipts for Deposits
We will give you a receipt for the total amount shown on your deposit ticket, but the amount must be verified before it is credited to your account. If an error is discovered in the amount of your deposit, we will adjust your account and notify you of the correction.
In line with the above rules, the bank accepted the check for deposit on January 20, 2012, and temporarily credited SMC’s trust account for the amount of the check. While the teller erred in not recognizing the check as a foreign check, SMC also failed to recognize the check as a foreign check. To the extent that SMC relies on provisions under the bank’s rules governing deposit accounts to delineate its and the bank’s obligations, it cannot ignore the rule providing that foreign checks are han- *1217 died as collection items only. Regardless of the error on the part of the bank’s teller, the bank discovered the error in the deposit, namely that the check was a foreign check to be handled as a collection item only, and reversed the temporary credit that same date as shown by SMC’s online banking records in evidence. The bank generated a notification letter that same night, January 20, 2012, but it was not mailed until January 24, 2012. The “Rules Governing Deposit Accounts” state, “Any and' all notices to you shall be deemed effective when mailed to your address as reflected in our records.” Thus, notice regarding the correction of the deposit was effective when mailed on January 24, 2012, two days prior to the wire transfer. Moreover, the record indicates that the deposit correction would have appeared on SMC’s online account well before receipt of the notification letter. For instance, the online account summary printed by SMC on |18January 26, 2012, after it received the notification letter, includes pending transactions for that very day. This suggests that the January 20, 2012, deposit and subsequent correction would have appeared online at or near its occurrence. In fact, the online banking printout shows both recorded on January 20, 2012.
We are not persuaded by SMC’s argument that it did what the rules governing deposit accounts required it to do by asking Lambert whether the check had cleared and that the bank breached its duty under these rules when Lambert told Rice and Carroll-Bridges that the check had cleared and the funds were available. SMC relies on provisions under the “Deposit Availability Disclosure” section of the rules. This section sets forth the bank’s general rule of making deposited funds available on the first business day after the day of the deposit and addresses exceptions where longer delays may apply or where holds may be placed on corresponding funds in the customer’s account when a bank cashes or accepts for deposit a check that is drawn on another bank. Provisions under this section generally advise the customer to contact a banking officer or relationship banker if he or she has questions about when funds from a deposit will be available or if funds deposited will be needed right away. Nothing .in this section addresses foreign checks that are treated as collection items only or even mandates that customers consult a bank’s representative about whether deposited checks have cleared. Rather, this section addresses provisional availability of deposited funds pending the bank’s receipt of final payment on the item. As stated in the rules quoted above, even though an account is | ^credited for the amount of an item deposited, such credit is temporary and may be reversed by the bank.
As explained by Wilson, the teller mistakenly treated the foreign check as a deposit. The erroneous deposit credited to SMC’s account on January 20, 2012, was reversed that same day. Wilson testified that by logging on to its online banking account, SMC could have seen the same thing anyone at the bank would see in checking SMC’s account, namely, that the deposit error had been corrected and the funds were not available in the account. Rice testified that SMC had access to online banking and used it to verify when checks written by SMC cleared its account. Rice admitted that she could have accessed online banking to verify whether the funds from the check were in SMC’s account, but she claimed that was not SMC’s policy. Morris, too, testified that SMC’s policy was to verify funds with the bank before writing a check from the trust account. He opined that checking the account online would have been “ridiculous” and that he would rather SMC depend on *1218 a “live screen” at the bank. However, this opinion lacks validity in light of Wilson’s testimony indicating that a customer with online access sees the same account information that is available to the bank. Notably, Rice, at Morris’s direction, checked the account online almost immediately after receiving the notification letter from the bank. The printout made at that time supports a finding that SMC could have learned prior to speaking with Lambert that the funds from the check were not in its account. Under these facts, we cannot find that SMC Improved the element of justifiable reliance required to recover for both negligent misrepresentation and detrimental reliance.
Having reviewed the contract between the bank and SMC, namely, the “Rules Governing Deposit Accounts,” we find no duty on the part of the bank to have informed SMC as to whether the foreign check had cleared, nor do we find that the bank breached its duty of ordinary care with regard to its handling of the check. As stated, the “Rules Governing Deposit Accounts” provide that foreign checks are handled as collection items only. Thus, with regard to the check, the bank was acting as a “collecting bank.”[5] The standard of ordinary care to be exercised by a collecting bank is provided by La. R.S. 10:4-202:
(a)A collecting bank must exercise ordinary care in:
(1) presenting an item or sending it for presentment;
(2) sending notice of dishonor or nonpayment or returning an item other than a documentary draft to the bank’s transferor after learning that the item has not been paid or accepted, as the case may be;
(3) settling for an item when the bank receives final settlement; and
(4) notifying its transferor of any loss or delay in transit within a reasonable time after discovery thereof.
(b) A collecting bank exercises ordinary care under Subsection (a) by taking proper action before its midnight deadline following receipt of an item, notice, or settlement. Taking proper action within a reasonably longer time may constitute the exercise of ordinary care, but the bank has the burden of establishing timeliness.
(c) Subject to Subsection (a)(1), a bank is not liable for the insolvency, neglect, misconduct, mistake, or default of another bank or person or for loss or destruction of an item in the possession of others or in transit.
IziThe record does not establish that the bank failed to exercise ordinary care in its handling of the check as the collecting bank under La. R.S. 10:4-202.
In Bank One, NA v. Dunn, 40,718 (La. App.2d Cir.4/12/06), 927 So.2d 645, unit denied, 2006-1121 (La.9/22/06), 937 So.2d 385, this court affirmed a judgment in favor of the bank by the same trial judge as in this matter. Dunn fell prey to a bizarre scheme involving the sale of computers to Nigeria. He complained that the bank wrongly credited his account for $315,000 before verifying that the check deposited into his account was legitimate. However, the court pointed out that Dunn “showed great alacrity in moving most of the funds from his account” the day after the deposit. Id., 40,718, p. 8, 927 So.2d at 650. This court noted that the defendant bank had no duty to protect Dunn from himself, and the facts showed that he ig *1219 nored red flags that could have prevented his loss. The same can be said in this case.
As shown by the facts, SMC’s contact with Oeki resulted from a spam email purportedly seeking representation for a debt collection matter in this state. However, nothing in the record indicates any relation between the alleged debt and this state. Despite requests by Savoie for specific information about the debt and debtor, none was provided. Testimony by Morris and Savoie indicated that whatever information they purportedly obtained about Oeki or Eki Trading, they learned over the Internet. According to Morris, because he found the name of the company and associated people on the Internet he concluded that they were “real characters.” Morris testified that Eki Trading was somehow involved in | ^manufacturing, while Savoie testified that “Eki Company loans are provided construction equipment machinery.” SMC received no retainer or other contract for its services from Oeki and apparently did nothing, such as send a demand letter or even contact the alleged debtor, to collect the alleged debt from “Radio Shack.” Having provided no collection services, SMC simply received a substantial check drawn on a foreign bank. The large check was accompanied by a short unsigned letter from a “Peter Andrews.” The letter made no mention of the debtor or the purpose of the debt nor identified Andrews’ role in the matter. The letter had no business address, and there was no return address on the envelope. Though Oeki had represented that the alleged debt was for $350,000, the letter that accompanied the check referred to an additional balance owed of $300,000 that would be forthcoming. SMC had numerous red flags that should have put it on notice that a scam was afoot. Instead, SMC chose to deposit the foreign check into its trust account. Based on Oeki’s claim that it would take 90 days for checks to clear in Japan, SMC then agreed to wire the funds rather than return the chéck. Finally, SMC could have easily learned that the deposit of the foreign check had been corrected and that the funds were not available in its trust account by accessing its account online in the days before speaking with Lambert, who had no knowledge about the suspect circumstances related to SMC’s receipt of the check or that Rice and Carroll-Bridges were inquiring about a foreign check rather than a typical domestic check.
[gjOn these facts, we find that the trial court was clearly wrong in assessing sole fault on the part of the defendants and manifestly erroneous in its apparent finding that SMC justifiably relied on Lambert’s representations about the check. SMC was in the best position to protect itself from the loss it suffered at the hands of the scam artists. Under the facts of this case, we find that the bank had no duty to protect SMC from the particular harm that it would be the victim of a check scam and that SMC was not justified in relying on Lambert’s representations regarding the check when it could have easily accessed its account information and learned that the funds from the check were not in its trust account.
Though a harsh result, jurisprudence from other states has favored the bank over similar victims who fell prey to such scams. In Greenberg, Trager & Herbst, LLP v. HSBC Bank USA, 17 N.Y.3d 565, 934 N.Y.S.2d 43, 958 N.E.2d 77 (2011), a summary judgment case, the court rejected the plaintiffs negligent misrepresentation claim that was based on HSBC informing the law firm that a check had cleared and the funds were available to be transferred. The court noted that UCC 4-201 does not impose a fiduciary duty on a collecting bank, which is merely the agent *1220 of the depositor. Any risk of loss concerning the item remains with the depositor / customer until the collecting bank receives final payment on the item. The court also considered the statement by HSBC’s representative that the check had cleared to be ambiguous and perhaps meant only that the amount of the check was available in the account. The court concluded that reliance on 124the bank representative’s statement as an assurance of final settlement was unreasonable as a matter of law under the circumstances of the case.
In Dixon, Laukitis, and Downing, P.C. v. Busey Bank, 373 IlLDee. 274, 993 N.E.2d 580 CDl.App.3d Dist.2013), the plaintiff law firm sued the bank for negligence alleging that it breached a duty of ordinary care by failing to inquire about the circumstances of how the law firm acquired the substantial check ($350,000 drawn on an account at a Canadian bank), by failing to recognize the check as a counterfeit, and by failing to inform the law firm that funds should not be withdrawn until final payment on the check. The trial court granted a motion to dismiss filed by the bank and the higher court affirmed. The court concluded that any duty owed by the bank to the law firm was defined under the account agreement and the UCC. The account agreement placed the risk of loss on the customer until final settlement of the check, and there was no allegation that the bank breached any duties imposed on a collecting bank under Section 4-202 of the UCC.[6] Referring to the Greenberg decision, discussed above, the court concluded that under both the UCC and the account agreement, the risk of loss remained with the depositor pending final settlement of the check.
While we are not bound to follow the above cases, they are persuasive and provide further support for our disposition of this matter.
For the reasons addressed in this opinion, we find that the trial court erred in assessing sole fault on the part of the bank and Lambert rather than on SMC, which was in the best position to have avoided this calamity.
^CONCLUSION
For the reasons set forth in this opinion, we reverse the trial court’s judgment awarding damages, attorney fees, costs, and expenses. The claims of SMC are hereby dismissed, and costs of appeal are assessed against SMC.
REVERSED and RENDERED.

. The email messages from Oeki are quoted as they were written.

. Though SMC deposited the $350,000 check in its client trust account, the record indicates that SMC did nothing to collect the debt on behalf of the alleged client. It received only vague information about the client and debt from Oeki. It obtained no retainer agreement. It sent no demand letters. It generated no invoice for its services.

. The defendants introduced into evidence an alert from the Louisiana State Bar Association to its members warning them of similar scams targeting lawyers in Louisiana.

. La. R.S. 10:4-103(a) provides that while the provisions of the Commercial Laws may be varied by agreement, the parties "cannot disclaim a bank's responsibility for its lack of good faith or failure to exercise ordinary care or limit the measure of damages for the lack or failure.”

. La. R.S. 10:4-105(5) defines a “collecting bank” as "a bank handling an item for collection except the payor bank.”

. See prior discussion in this opinion of the corresponding provision La. R.S. 10:4 — 202.